GIBBS HOWARD v. THE STATE.

No. 6620.     Decided May 31, 1922.

1.—Murder—Evidence—Hearsay—Coercion—Hearsay.

Where, upon trial of murder, the main State's witness had testified that he was coerced into taking part in the homicide, and stated the particulars

and details of the same, it was reversible error to permit the sheriff and two deputies to testify that some weeks after the alleged killing, and while defendant was in jail, they went with said State's witness to the place where he claimed the killing occurred, and the witness there showed them and pointed out to them the different places and told the incidents that occurred during the homicide, and to permit the sheriff and deputies to testify to this declaration and acts of the witness before the jury. Distinguishing Cannon v. State, 32 S. W. Rep., 518; Funk v. State, 208 id., 513.

2.—Same—Evidence—Acts and Declarations of Co-Conspirators.

While it would have been permissible for the officers to testify that they went with the main State's witness to the alleged scene of the homicide, and as to what they saw there, it was not permissible for them to testify to what said witness said about the places and things they saw. Acts and declarations of co-conspirators, after the commission of the offense, are not admissible in evidence.

3.—Same—Evidence—Bill of Exceptions—Declarations of Witness—Hearsay.

While there was no error in permitting testimony as to the surroundings of the scene of the homicide, yet statements to the effect that this, that, of the other was shown or pointed out by the State's witness, was inadmissible.

4.—Same—Malice—Ill-Will—Evidence.

Evidence tending to show malice or ill-will of the moving spirit in the conspiracy was admissible in evidence, but should be properly limited by the court.

5.—Same—Evidence—Co-Conspirator—Conversation—Rule Stated—Cross-Examination.

Where a State's witness gave damaging testimony in the shape of a conversation claimed to have been had with the main conspirator not the defendant, in the absence of the latter, sometime after the homicide, in which the said conspirator admitted his own part in the killing, and told what defendant and others did at the same time, the same was reversible error, and this testimony did not come within Article 811, C. C. P., which allows, at the instance of either party, the introduction in evidence of all the conversation, etc., as the matter in cross-examination was not on the same subject introduced by the opposite party. Following Payne v. State, 212 S. W. Rep., 161, and other cases.

6.—Same—Evidence—Hearsay.

It was not proper for the State to prove by other witnesses that another State's witness, while in jail, made statements or maps and diagrams, by means of which said witnesses found certain buried whisky, and based upon information, as such statements were but added hearsay.

7.—Same—Evidence—Weight of Evidence.

There was no error in the admission of testimony of finding a certain substance on the saddle which figured in the homicide, which resembled that of blood, and the testimony of the physicians who examined the same.

**8.—Same—Duress—Accomplice—Charge of Court—Corroboration.**

Where the main State's witness testified that he had been coerced in participating in the homicide, and the court instructed the jury upon the theory of duress as applied to said witness, and instructed the jury that if said witness were forced and compelled to do what he did, in connection with the killing, then he would be guilty of no offense, and would not be an accomplice within the meaning of that term, in that portion of the charge defining accomplice testimony. This was reversible error under the facts in the instant case.

**9.—Same—Accomplice—Corroboration—Words and Phrases.**

The requirement by statute that the testimony of an accomplice be corroborated is used in a broader sense than the technical meaning attaching to said words in the Penal Code, and includes principals, accessories, co-conspirators, and in fact all persons who are connected with the crime by unlawful acts, declarations, or omissions, whether antecedent, contemporaneously, or subsequent to the main act constituting the crime, and where the acts and declarations of such State's witness brought him within the category of persons who aid those actually committing crime to evade arrest and trial, etc., the court should have submitted a charge on corroboration of accomplice's testimony.

**10.—Same—Corroboration—insufficiency of Evidence.—Rule Stated.**

While the court forbears expressing an opinion as to concrete facts in evidence, in view of another trial, it must be borne in mind that it is not enough that the state show facts whose tendency is to corroborate an accomplice, but such facts must further point to the accused as a guilty participant.

Appeal from the District Court of Comanche. Tried below before the Honorable J. R. McClellan.

Appeal from a conviction of murder; penalty, death.

The opinion states the case.

*Callaway & Callaway*, and *Wilkinson & McGaugh*, for appellant.—On question of admitting testimony of accomplice and hearsay statement: Conde v. State, 35 Texas Crim. Rep., 98; Carroll v. State, 83 id., 369; and cases cited in opinion.

*R. G. Storey*, Assistant Attorney General, and *J. H. Eidson*, District Attorney, for the State.—Cited: Goodman v. State, 83 S. W. Rep., 196, and cases cited in opinion.

LATTIMORE, JUDGE.—Appellant was convicted in the District Court of Comanche County of murder, and his punishment fixed at death.

Following the finding on the railroad track of the Frisco Railway not far from the town of Hasse in Commanche County on the morning of May 13, 1921, of the dead body of Jack McCurdy, came the indictment and conviction of appellant, one Ed Walker and W. W. Wilman for the alleged murder of said McCurdy. The statement of facts in

the instant case covers more than 300 pages. We only state enough of the facts to make clear the opinion. From the record we conclude the jury justified in finding that McCurdy came to his death at the hands of some party or parties on the night of May 12, 1921, and that his body was placed on the track of the railroad for the apparent purpose of giving rise to the belief that he was killed by accident. When found the next morning the body was badly broken and mangled, an arm cut off, feet and legs mashed and other portions of the body scattered along the track for a distance of fifty feet. Little or no blood was found. The practically uninjured boots of deceased were found separated from any portion of the body, but his feet with the socks still on them were badly crushed.

Earl Henry for the State swore that Walker and Wilman killed McCurdy about dark at the home of Wilman and that witness was present, and started to flee but that appellant, who was present and acting with those just named, shot at him with a pistol and ordered him back. That after deceased had been beaten to death by Walker and Wilman, witness aided them and appellant to place the body on a quilt and then on a horse ridden by Walker, and that Wilman riding another horse by the side of that ridden by Walker, between them carried the body to a point near the railroad track where they were met by witness and appellant who had gone to the place on foot, and the four of them placed the body of deceased on the track. After this was done the boots were removed from the feet of deceased by Wilman, who put them on and proceeded to make tracks leading from a path up to the point where the body was placed, so that it would appear as though deceased had walked up the path and on to the track. The boots were then left near the body. Henry further stated that the three men then demanded of him that he aid them in every way in concealing the crime and threatened him with dire consequences if he did not say and do all he could to help them in this matter. He testified that he went home after leaving them and there took the spurs of deceased from the horn of his saddle and hid them, and likewise hid parts of a liquor making outfit which had been used by the parties. Henry is shown to have made various statements before the coroner's inquest and to the grand jury favorable to the accused men which were explained by him on the witness stand, as well as his other acts favorable to them, on the hypothesis that he feared for his own life. Whether Henry was an accomplice seems to have been considered an issue, but the chief contest was over the corroboration of said witness. For the State it was contended that there was ill-feeling on the part of Walker and the others toward deceased growing out of illicit liquor transactions, and that the men accused had been concerned in making whisky on premises controlled by the deceased and had been notified by him that this misconduct must stop. It was further shown that deceased had been to Comanche, the county

seat, on the day he was killed, and the State claimed that the three accused men believed that he had gone before the grand jury and reported their misdoings in regard to the whisky business.

There seems no contest of the fact that McCurdy and Henry were together in the town of Hasse, a mile or more from where the body was found, until a rather late hour in the afternoon of May 12th. McCurdy lived in Hasse and his business was the management of a large tract of land, principally pasture lands, a short distance from Hasse, on which land lived Wilman and Henry and which tract nearly surrounded the land on which Walker lived. Appellant also lived in Hasse. It seems not controverted that deceased and Henry left Hasse in the late afternoon of said day going to the home of Henry. After their arrival Mrs. Henry and her sister left the two men there. Later they went to the house of Wilman. From this point the testimony is contradictory. Without going into details State witness Henry claimed that soon after he and McCurdy got to Wilman's house and while they with Wilman were sitting on the edge of the porch Walker and appellant rode up, one on a black and the other on a gray horse. They dismounted. Almost at once a quarrel arose over the supposed visit of deceased to the grand jury on that day. Walker and Wilman assaulted deceased, and Henry says he started to run and that appellant shot at him with a pistol and made him come back, and from that time on until after Henry was arrested and apparently concluded to tell a different story, he seems to have talked, acted and testified in every way as though neither he nor the other three men knew anything of the killing. Henry's testimony on the instant trial suggested the theory of duress in regard to such acts and conversation.

The defense was an alibi for appellant and Walker, that they neither saw nor had anything to do with McCurdy that night, and for Wilman essentially the same, the defense witnesses claiming that Henry and deceased were drunk at Wilman's house and left separately, Henry to go to his house and deceased to go to Hasse, and that thereafter deceased was killed by some means unknown to those at Wilman's. The nearest way from the home of Wilman to Hasse appeared to be up the railroad track. These matters just mentioned appear in the testimony in this case.

By bill of exceptions No. 6 appellant complains that the sheriff and two deputies were permitted to testify that on or about May 31, 1921, some weeks after the alleged killing and while appellant was in jail, they went with Henry to the place where he claimed the killing occurred, and the bill sets out what they testified that Henry did as follows:

"Showed to each of them and pointed out the place where he, the said Henry, claimed that he and the defendant Gibbs Howard stood and where this defendant and Ed Walker had stood, when as he claimed, Jack McCurdy was knocked down and killed and the court

permitted each of the said witnesses over defendant's objections to testify that the said Earl Henry had pointed out to them where he ran before he was shot at. by Gibbs Howard, at the time the murder was supposed to have been committed, and the place where he had stopped and turned back when Gibbs Howard shot at him, and the place where he claimed the bullet passed through the trees near him at said time and the place where he claimed that the defendants W. W. Wilman and Ed Walker had rode their horses carrying the body of the deceased to the railroad track, and to testify that the said witness Henry showed and pointed out to them a certain post oak tree or sapling where he told them said horses were tied, and each of said witnesses was permitted to state, over the objections of the defendant that the said Earl Henry had pointed out to them where he had hidden a certain pair of spurs belonging to the deceased Jack McCurdy, and a certain whisky coil which the witness stated belonged to him and the said Jack McCurdy and which he had buried; and the court permitted each of the three said witnesses to testify, over defendant's objections, that they had found the said spurs and the whisky coil buried at the place shown them by the said witness, and had found certain broken twigs where the said witness Earl Henry claimed the bullet had passed through the trees at the time he was shot at.''

This was objected to as hearsay, being out of the presence and hearing of the appellant, who was in jail. The state's position seems to be that this evidence is in the nature of a confession, or statement while under arrest, which was admissible by reason of its being found to be true, and which conduced to show guilt. In addition to the objections above mentioned appellant contended that this was an effort to corroborate Henry by proof of his own hearsay acts and statements. We' cannot assent to the application of the rule invoked by the State. The authorities cited in support of admitting the testimony are Kennon v. State, 82 S. W. Rep., 518; Funk v. State, 84 Texas Crim. Rep., 402, 208 S. W. Rep., 513, and those cases collated on page 37 of Branch's Ann. P. C. There is nothing in the Kennon case which in our opinion at all supports the State's contention. Referring to the Funk case, we think the State misapprehends this authority, and in view of the fact that it is not stated in the opinion in said case just what was before the trial court when he permitted the evidence of the sheriff relative to his going to a certain culvert and there finding three pistols, and that this was under the direction of other participants in the homicide than the accused on trial, we have examined anew the record on file in the office of the clerk of this court in said Funk case and now state that the bill of exceptions in that record relating to this particular matter shows that the sheriff, some time after the homicide, went after two men who were charged with the killing and brought them to San Antonio and placed them

in jail. While testifying as a witness on the trial he was asked: "After talking to them what if anything did you do?" This was objected to for many and various reasons. The bill shows that in the colloquy between the trial court and the witness, the court told the sheriff that he must not state anything said by the two men, nor must he state that it was on information that he got said pistols. The witness then testified that after arriving at San Antonio with said men he went to a little bridge north of Brackenridge Park on the road to Wetmore and got these three pistols, which were identified by him. This was the extent of his testimony. The Funk case is not to be taken as authority for the introduction of evidence which is hearsay, for no hearsay evidence was before the court. As rightly understood said case does not uphold the introduction of the evidence under discussion. Reference to the citation from Mr. Branch's work discloses only a general statement that a confession is admissible if in connection therewith a statement is made which is found to be true, which conduces to establish guilt. Unless the introduction of the evidence in the instant case can be sustained under some other rule, it must be held inadmissible. If Henry was not implicated in the murder, the testimony of these witnesses that Henry showed then the place where he claimed that he and Gibbs Howard stood,—or the place that he claimed Ed Walker stood when Jack McCurdy was knocked down and killed,—or the place where he stopped and turned back when Gibbs Howard shot at him,—or the place where he claimed the bullet passed through the trees,—or the place where he claimed Wilman and Walker rode carrying the body of deceased to the railroad track,—or to certain trees where he claimed the horses were tied, is necessarily the narration of what they learned from him and purely hearsay. If it be claimed that Henry was so connected with the homicide as to make him have a guilty connection, the evidence under discussion would appear to be obnoxious to the rule which excludes the acts and declarations of co-conspirators done or made in the absence of the accused on trial, and after the commission of the offense. It would have been permissible for the officers to testify that they went to Wilman's house, alone or with Henry, and as to what they saw there or elsewhere, but not to testify in effect to what Henry said about the places and things they saw. Mr. Branch cites many authorities in Sec. 695 of his Annotated P. C., which uphold the rule that acts and declarations of co-conspirators after the commission of the crime and out of the presence of the accused are not admissible. we are not aware of any exception to said rule which would admit the testimony under discussion.

Complaint of the testimony as to the surroundings of the Wilman house, including that relative to certain ash piles, would seem groundless, except in so far as the testimony relative thereto embodied statements to the effect that this or the other was shown or pointed out by Henry.

Ed Walker seems to be claimed by the State as the moving spirit in any conspiracy or plot to kill deceased. Evidence tending to show malice or ill-will of Walker against deceased would seem to be admissible, but should be properly limited by the court.

John Tyler gave very damaging testimony in the shape of a conversation claimed to have been had with Ed Walker some time after the homicide, in which he said that Walker admitted his own part in the killing and told what Wilman and appellant did at the same time. Appellant's objection to this would seem sound unless it became admissible under the rule referred to by the trial court in his qualification to the bill of exceptions presenting this complaint. Unless admissible for the reasons there mentioned, this conversation would clearly seem to be the statement of a co-conspirator after the conspiracy or plot to kill had been executed, which conversation was out of the presence and hearing of appellant. The trial court in his qualification to this bill says that he refused to admit Tyler's testimony as to the conversation complained of, until after a severe cross-examination by the defense, which was concluded by the following question to said witness: "Is it not a fact that the only thing you and Ed Walker talked about in that conversation was the whisky business?" To which question Tyler answered no, and the defense asked no further question. It appears from the record that thereupon the State asked the witness to state all of the conversation he had with Walker relative to the killing, and that over the objection of appellant he proceeded to do so. In the opinion of the learned trial court this evidence was admissible under Article 811 of our Code of Criminal Procedure, which allows at the instance of either party, all of any act, declaration or conversation relating to given subject, when the opposite party has put in evidence any part of same. The question thus arises,—What conversation relating to a given subject, when the opposite party has evidence by its questions to this witness? Unless some part of a conversation relating to such killing was so put in evidence, the State would have no right to the remainder. We quote all that part of the cross-examination which relates to any conversation with Walker:

"Ed Walker had told me where this whisky was and I went and found it and put it back. He told me about this at an automobile right by the hotel over there in Hasse. About the whisky making is not all that Ed Walked told me about. I am not lying about anything I said. I am telling the truth."

On redirect examination the State asked said witnesses as follows:

"Q. Mr. Calloway asked you if it was not a fact that all Ed Walker ever told you was about whisky making and I ask you on direct examination if Walker ever told you anything with reference to the killing of Jack McCurdy. A. Yes, sir. Q. Now, just state the entire conversation you had with Ed Walker, you said that was

not all he told you. Now what was it he told you about the murder of Jack McCurdy?''

The witness then told all the purported conversation with Walker in which was set forth the guilt of this murder, of all three of the men accused. In our view the action of the learned trial court in admitting that part of said conversation, was erroneous. The defense had not drawn out in evidence any of said conversation relative to the killing of McCurdy. The witness on direct examination said that Walker had made a statement to him about Jack McCurdy being killed, and on cross-examination said witness had been asked if the conversation he had with Walker did not relate only to the whisky business, which question he answered in the negative. Did the defense by this question, negatively answered, ''put in evidence'' any part of said conversation *relative to said killing?''* We are unable to perceive upon what sound theory this claim is based. The mere asking the question if it was not true that the conversation he had with Walker was only about the whisky business, would not seem to *put in evidence* any of said conversation which related to subjects other than such whisky business. A tells B of a fishing trip on which he and C raped a woman. C is tried for the offense of rape. B is on the witness stand and testified among other things that A told him of trouble with the woman. On cross-examination by the defense B is asked if the conversation he had with A did not relate solely to fishing, and answers no. Can it be said that the defense thus *put in evidence* any part of the conversation on the subject of the rape. Not so. In Wood v. State, 80 Texas Crim. Rep., 398, a rape case, the accused placed a witness on the stand who testified on direct examination that he had hugged and kissed prosecutrix while going with her. On cross-examination by the State he was asked if he told appellant about this, which he answered in the negative. Appellant was not allowed to prove what in fact he claimed this witness had told him in regard to this matter. This court approved such refusal. In Irby v. State, 25 Texas Crim. App., 203, the defense brought out certain parts of a conversation had by a doctor with deceased after the shooting. We quote from the opinion:

''On cross-examination of the witness the State called for and was permitted to prove the statements of deceased, detailing the circumstances of the shooting, as part of the conversation elicited by the defendant as above stated. In this ruling we think the court erred. The question proponded by defendant to his witness Longmire did not call for any conversation with deceased or for any declaration or statements made by deceased in relation to the shooting. It merely called for the reasons upon which the witness based his opinion that the deceased was not mortally wounded. This testimony was, in our opinion, clearly incompetent and very prejudicial to the defendant.''

In Payne v. State, 85 Texas Crim. Rep., 288, 212 S. W. Rep., 161, in

discussing the limitation on the matters which are legitimate in a somewhat similar case, Judge Davidson says: "It is a familiar rule, and fixed by statute, that where a part of a conversation is brought out, and the remaining portion of the conversation is necessary to make the preceding part of the conversation clear, or that it might be explanatory of the preceding part of the conversation, it would be admissible. This redirect examination by the State does not seem to fall within that rule. Appellant had asked nothing that led to the statement either of his wife or his sister-in-law that they desired that the witness should flee the country. It was in no way chargeable to him under the bill of exceptions. It was very damaging testimony, and of a criminative tendency. If appellant had sent his wife or her sister, either or both, to the witness to induce him to leave, or had suggested to them to induce him to leave, it would be a fact against him and introducible; but this bill not only fails to connect him with it, but shows that he knew nothing about it, was not present, and in no way a party to it. It was not germane to that brought out by the defendant from the wife or her sister."

Article 811, supra, plainly states that when part of an act or declaration is introduced by one party, any other part or all thereof *on the same subject* may be introduced by the opposite party. The test is: Is that part offered by the opposite party *on the same subject?* If not, it is not admissible even though it be in the same conversation. The State cites only the Kennon and Funk cases, supra, and Gallagher v. State, 28 Texas Crim. App., 247, and in none of them do we find authority for admitting this evidence. Appellant having elicited no part of the conversation on the subject of the killing, it was material error for the State to introduce same.

Nor do we think it proper for the State to prove by other witnesses that Tyler, while in jail and based on information given him by Ed Walker, made statements or maps and diagrams by means of which said witnesses found certain buried whisky. Walker's statements to Tyler were hearsay and out of the presence of this appellant, and Tyler's statements and maps were but added hearsay, and the testimony of the finding of the buried liquor at the place indicated by Tyler, either by word of mouth or map, could only add the dangerous possibility that the jury might mistakenly think this fact corroborative of Tyler in what he said Walker had said to him implicating this appellant.

We perceive no error in allowing the State witness who had loaned a saddle to Walker the day before the alleged homicide, to testify to the finding of a substance thereon later that resembled blood, nor in admitting the testimony of the physician who examined said substance, to the effect that in their opinion it was blood. That there was no evidence that it was human blood, would go to the weight and not to the admissibility of said testimony.

The court instructed the jury upon the theory of duress as applied and related to whether or not Earl Henry was an accomplice, and after giving to them a definition of duress, in substance told them if Henry was forced and compelled to do what he did in connection with the killing of McCurdy, then he would be guilty of no offense, and would not be an accomplice within the meaning of that term in that portion of the charge defining accomplice testimony. An examination of the record discloses that not only did Henry say that he was present when the killing took place, and that he took compulsory part in the disposition of the body of the deceased, but he also said that after he left Walker, et al., on that fatal night, he went home by himself and there took from the horn of deceased's saddle his spurs and hid them, and that he then buried machinery used by the various parties connected with this transaction in making liquor, and the next day and on other occasions he repeatedly made statements which he knew were false for the purpose of concealing the guilt of said parties. All our decisions hold that the word accomplice in Article 801 of our Code of Criminal Procedure, wherein is the requirement by statute that the testimony of an accomplice be corroborated, is used in a broader sense than the technical meaning attaching to said word in Chapter 2 of Title 3 of our Penal Code, and that in this broad or evidential sense it includes principals, accessories, co-conspirators, and in fact all persons who are connected with the crime by unlawful acts, declarations or omissions, whether antecedent, contemporaneous with or subsequent to the main act constituting the crime. Authorities are too numerous to call for citation. One who knows that a crime has been committed and purposely conceals the offender, or gives him any aid in order that he may evade arrest, trial or the execution of sentence, is an accessory under Art. 86 of our penal Code. In Blakely v. State, 24 Texas Crim. App., 616, it is held that one who falsely gives evidence favorable to one accused of crime with a view of aiding him to evade arrest or punishment, is an accessory and punishable as such. From this record it appears that Henry's acts and declarations both, bring him in the category of persons who aid those actually committing crime to evade arrest and trial. Else why hide incriminating evidence? Why make false statements favorable to such persons before the officers and the grand jury? In the charge of the court defining duress by means of threats, the following appears: ''The act must be done when the person threatening is actually present.'' It could hardly be claimed by the State in the face of this record that Earl Henry did no acts, made no false statements, the apparent purpose and effect of which were to aid Walker, et al., except when one of the three accused was present. How then could duress arise or find support when these appear to be the facts?

If the principle contained in the court's charge be sound, said charge was still not applicable because not called for by the facts. If such

charge be the law, it should not be given when the undisputed evidence shows acts and declarations of the alleged accomplice out of the presence and hearing of those accused, which acts and declarations would unquestionably bring him within the meaning of an accomplice. None of the authorities cited by the State relate to accomplice witnesses, nor does Article 44 of our Penal Code so relate. The State cites Wharton on Homicide, p. 68. The discussion there refers solely to duress as excusing crime, but we observe that after stating that in order to amount to duress the act or threat must portend immediate injury in the event the party threatened refuses to aid in the criminal enterprise, Mr. Wharton says: "But, if after the danger passes, he continues to consent, advise, aid, abet or assist in such act, he is as guilty as if such danger had never threatened him," citing Baxter v. People, 8 Ill., 368. Again the learned author says: "A mere threat to take one's life unless he aids in the commission of a homicide, with nothing more, does not amount to a sufficient excuse for committing such homicide." Other expressions are to the same effect. If the principle involved in this charge be granted as correct, would we not be confronted with the further anomalous proposition in a case such as the one before us, that here is one who has so connected himself, or been so connected by other evidence, with a crime as to make him an accomplice; his testimony is therefore tainted by the law; a conviction cannot rest on it alone; yet by his testimony alone he seeks to be extricated from this mire of taint by simply saying that he feared for his life when he acted or made the declaration. Who corroborates him in his testimony cleansing himself? Are we to submit the question based on his unsupported testimony as one of fact to the jury as to whether he acted under duress, and if so that he is not an accomplice? If they convict, then shall we hold that by such verdict, ipso facto the jury found him to have been under duress and therefore not an accomplice? It is a dangerous doctrine. It is well settled that an accomplice cannot corroborate himself. How then can he extricate himself from the position of such accomplice by his own testimony alone? In Smith v. State, 89 Texas Crim. Rep., 145, in discussing a kindred question relative to one who acted with others in crime and then claimed that his act was only to detect and punish crime, we said:

"So far as we have observed cases in which the courts have held that one who took part in the commission of the offense was, as a matter of law, not an accomplice witness, they are those cases in which his innocent intent was established by testimony other than his own; cases in which he has in advance made known to others that he planned to act with the real offenders in order to entrap them. Chitister v. State, 33 Texas Crim. Rep., 635; Sanchez v. State, 48 Texas Crim. Rep., 591; Wright v. State, 7 Texas Crim. Rep., 574; Johnson v. State, 3 Texas Crim. Rep., 590; Clay v. State, 40 Texas Crim. Rep.,

560; Penn v. State, 43 Texas Crim. Rep., 608; Minter v. State, 70 Texas Crim. Rep., 644.''

In Blakely v. State, 24 Texas Crim. App., 616, where there was a claim that an accomplice witness was coerced, this court said:

''Now, it is in proof that defendant and these two witnesses were alone present when the matters transpired with regard to the fabricated statement about which they have testified; that is, that he told them what they should swear, and induced them to swear it. In agreeing to do so and in doing so, no matter what the motive, they made themselves accomplices, or particeps criminis in the offense which was committed by their false testimony. If a witness implicates himself, it is immaterial that he claims to have been coerced. (Davis v. The State, 2 Texas Ct. App., 588; Freeman v. The State, 11 Texas Ct. App., 92).''

In Davis v. State, 2 Texas Crim. App., 603, one Miller turned State's evidence and tried to exculpate himself by saying that he was compelled by threats against his own life to take part in the crime. This court held that the law of accomplice testimony applied to him and should have been submitted in the charge, notwithstanding such claim on Miller's part.

In our opinion this charge of the court was erroneous as not being applicable to the facts, and its soundness being seriously·questionable. The word accomplice in an evidential sense is well understood, and if the court submits the definitions of accomplice, principal and accessory and tells the jury that if in any of these ways the witness knowingly and voluntarily connects himself, or is connected by other evidence, with the commission of the crime in question, he is an accomplice, otherwise he is not, this would seem to us ordinarily sufficient to present the question as to whether he be an accomplice.

Under the testimony in this record we are much concerned over whether there is such doubt as to Henry being an accomplice as to permit the question be submitted to the jury. If Blakely v. State, supra,—wherein it was held that one who falsely gives evidence favorable to one who has committed a crime with a view of aiding him or assisting him to evade punishment or arrest, or obtain a lighter punishment, is an accessory and punishable as such,—is sound, this would seem to apply to Henry. That at some stage in the instant transaction Henry did give false testimony favorable to these men and did do acts apparently in aid of them in their absence, seems beyond dispute. That he was not under legal duress as defined by the learned trial judge at such times would also seem equally clear.

The question that has given us most concern in this case is the sufficiency of the testimony to corroborate the witness Henry. Aside from his statement of appellant's connection with the case we have found difficulty in finding what there is in this record which to the unbiased mind connects or tends to connect Howard with the killing.

In view of another trial we forbear expressing opinion as to concrete facts in evidence, but it must be borne in mind that it not enough that the State show facts whose tendency is to corroborate an accomplice in showing that a crime has been committed, but such facts must further point to the accused as a guilty participant. Eliminating from its consideration the testimony of Henry, the fair mind must be able to find in the record other evidence which leads to the belief in some degree that McCurdy's death was brought about by this appellant acting alone or with other parties. This is the plain requirement which our law-makers have written into the statute in Art. 801 P. C., and we must obey and follow its mandates, however atrocious and fearful may be the crime whose story is laid before us. This court knows no other guide to its action than the law as written and understood by us.

Without further discussion of the facts, and for the reasons above stated, the judgment of the trial court will be reversed and the cause remanded.

*Reversed and remanded.*