George Edward CLARK, Appellant,

v.

The STATE of Texas, Appellee.

No. 62,696.

Court of Criminal Appeals of Texas.

Sept. 23, 1981.

On Rehearing Feb. 17, 1982.

Gary DeShazo, Hubert L. Gill and Linda Cangelosi, court appointed, Roy E. Greenwood, on appeal only, Austin, for appellant.

Ronald Earle, Dist. Atty. and David Douglas, Asst. Dist. Atty., Stephen B. Edwards, Asst. Atty. Gen., Robert Huttash, State's Atty., Austin, for the State.

## OPINION

TOM G. DAVIS, Judge.

Appeal is taken from a conviction for capital murder. V.T.C.A. Penal Code, Sec. 19.03(a)(2). After finding appellant guilty, the jury answered "yes" to the first two special issues submitted under Art. 37.-071(b), V.A.C.C.P. Punishment was assessed at death.

Appellant was convicted of murdering Ann Tracy Drummond during the course of an aggravated rape in Austin on March 3, 1978. The victim died as a result of thirty-eight stab wounds to the neck, chest, abdomen and back.

In his tenth ground of error, appellant maintains the court erred in overruling his objection to testimony presented during the punishment phase of the trial by Dr. Richard Coons. Appellant maintains such testimony was admitted in violation of his rights against self-incrimination and assistance of counsel.

Officer Roger Napier, of the Austin Police Department, testified that at 1:00 a. m., on March 6, 1978, appellant signed a written statement admitting his guilt in the instant offense. Officer Doyne Bailey, of the Austin Police Department, then filed a complaint against appellant charging him with the capital murder of Drummond. At 4:30 a. m., appellant appeared before the Honorable Harriet M. Murphy, Associate Municipal Judge for the City of Austin, and was administered his warnings pursuant to Art. 15.17(a), V.A.C.C.P. A warrant of arrest was issued by Judge Murphy and appellant was ordered held without bond. On March 7, 1978, the Honorable Hubert Gill was appointed to represent appellant. An indictment charging appellant with the capital murder of Drummond was returned and filed on March 9, 1978.

Coons testified that he is a psychiatrist practicing in Austin. He related that during the course of his practice he has examined four to six hundred criminal defendants and has testified in approximately one hundred trials. On March 6, 1978, Coons was requested to interview appellant by the Travis County District Attorney's Office. He related that based upon his past experience, it was understood that in a potential capital murder case, he was to make an evaluation of "dangerousness" in addition to considering the issues of competency and sanity. Coons interviewed appellant for approximately eighty minutes in the Austin city jail on March 6.

With regard to any warnings given appellant as to the purpose of the interview, Coons testified:

"Q. Did you give or did you hear anybody give George Edward Clark any warnings concerning any right to remain silent, any right to an attorney, any statement that whatever he said could be used against him at the punishment phase of the trial in order to try to convince the jury to give him the death penalty?

"A. Did I hear him—

"Q. Did you give him those warnings or hear anyone else give him those warnings?

"A. I did not specifically. I mean I told him who I was, where I was from and the purpose that I was seeing him, but I did not go into a specific description of exactly how my information might be used."

Coons was questioned relative to appellant being represented by counsel at the time of the interview and stated as follows:

"Q. At that time did he have an attorney, to your knowledge?

"A. I don't recall.

"Q. You don't recall seeing an attorney there or having personal contact with one?

"A. No."

During the punishment phase of the trial, Coons testified as follows:

"Q. Were you able to make a diagnosis of what type of, let's say, personality the defendant has—traits, personality traits?

"A. I would say his personality traits are those of inadequacy and immaturity, and basically kind of a dependent overcompensating person who has some conscience defects.

". . .

"Q. Doctor, do you have an opinion as to whether there is a probability that the defendant would commit criminal acts of violence which would constitute a continuing threat to society?

"A. Yes.

"Q. And what is that opinion?

"A. I think there is that probability.

"Q. And why do you think there is that probability?

"A. I think that Mr. Clark does not recognize some personality traits that he has, and I think that he has some conscience defects, and I think that he has a style of dealing with threat, an aggressive style of dealing with threats, and I think that he would be likely to put himself in positions where he would be threatened, just like abducting a girl is going to put you intellectibly into a position of being threatened. Somewhere down the line forcibly abducting an individual will almost always forcibly put you in a threatening situation.

". . .

"Q. Did you have an opinion as to whether or not he killed her deliberately?

"A. Yes. I think that his behavior and acts were deliberate in the silencing her, and the result of silencing her was her death. And I would consider that he was willing to go to that level to silence her and stem the threat, and I believe his behavior was deliberate on that occasion in that regard."

The record does not reflect that appellant raised the issues of competency or sanity during trial. After Coons testified, appellant called Dr. Richard Rada, a psychiatrist from Albuquerque, New Mexico. Rada testified that at the request of appellant's counsel, he had examined appellant for four and one-half hours on July 2, 1978. In response to questions from appellant's counsel, Rada testified:

"Q. Let me ask you this: Now, assuming that the defendant is sentenced to a term of life imprisonment in the Texas Department of Corrections, do you have an opinion on whether or not there is a probability

that he would commit criminal acts of violence that would constitute a continuing threat to society?

"A. Do I have an opinion on that?

"Q. Yes.

"A. Yes, I do.

"Q. What is that opinion?

"A. No, he would not.

" . . .

"Q. In terms of using the word 'deliberate,' how would you define that word?

"A. Well, I would understand the word deliberate to mean that somebody can deliberate; they can rationally look at various alternatives and decide how they are going to proceed in a particular situation.

"Q. With that definition in mind, do you have an opinion as to whether or not the conduct of the defendant in killing the deceased was done deliberately and with the reasonable expectation that death would occur?

"A. Yes, I have an opinion on that.

"Q. What is that opinion?

"A. No, that that was not the case."

At the time of the examination by Coons, appellant was in custody and his competency to stand trial or sanity at the time of the offense had not been raised. Indeed, such issues were never raised at trial by appellant. The interview was initiated through a request to Coons by the Travis County District Attorney's Office with an "understanding" that he was to explore the issue of "dangerousness" in that the case was "potentially a capital murder." The record does not contain an order from the court directing Coons to examine appellant.

The record fails to reflect that appellant was advised before the pretrial psychiatric examination that he had a right to remain silent and that any statement he made could be used against him at the punishment phase. In *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981), the Supreme Court considered the necessity of such warnings in a factual situation similar to that now presented and stated as follows:

"The considerations calling for the accused to be warned prior to custodial interrogation apply with no less force to the pretrial psychiatric examination at issue here. Respondent was in custody at the Dallas County Jail when the examination was ordered and when it was conducted. That respondent was questioned by a psychiatrist designated by the trial court to conduct a neutral competency examination, rather than by a police officer, government informant, or prosecuting attorney, is immaterial. When Dr. Grigson went beyond simply reporting to the court on the issue of competence and testified for the prosecution at the penalty phase on the crucial issue of respondent's future dangerousness, his role changed and became essentially like that of an agent of the State recounting unwarned statements made in a post-arrest custodial setting.

" . . .

"A criminal defendant, who neither initiates a psychiatric evaluation nor attempts to introduce any psychiatric evidence, may not be compelled to respond to a psychiatrist if his statements can be used against him at a capital sentencing proceeding. Because respondent did not voluntarily consent to the pretrial psychiatric examination after being informed of his right to remain silent and the possible use of his statements, the State could not rely on what he said to Dr. Grigson to establish his future dangerousness."

In the instant case, appellant did not initiate the psychiatric evaluation with Coons. However, appellant introduced psychiatric evidence from Rada after Coons had testified. This Court has held that the introduction of evidence seeking to meet, destroy or explain erroneously admitted evidence does not waive the error or render the error harmless. *Craddock v. State*, Tex.Cr.App., 553 S.W.2d 765; *Nicholas v. State*, Tex.Cr.App., 502 S.W.2d 169. We find that the introduction of Rada's testimony by appellant did not waive the error appellant seeks to present with regard to Coons' testimony.

The prosecution has the burden of proving that a person in custody knowingly and intelligently waived the privilege against self-incrimination. *Hill v. State*, Tex.Cr. App., 429 S.W.2d 481; *McCandless v. State*, Tex.Cr.App., 425 S.W.2d 636. In the instant case, the State failed to prove that appellant voluntarily consented to the pre-trial psychiatric examination by Coons after being informed of his right to remain silent and that any statement made could be used against him during the punishment phase. We find that Coons' testimony was admitted in violation of appellant's right against self-incrimination as provided by the Fifth and Fourteenth Amendments to the United States Constitution and Art. I, Sec. 10 of the Texas Constitution.

Appellant further urges that Coons' testimony was admitted in violation of his right to the assistance of counsel. He maintains that he should have been given an opportunity to consult with counsel concerning his participation in the examination prior to the time he was interviewed by Coons.

In *Estelle v. Smith*, supra, the Supreme Court stated as follows with regard to a defendant's right to the assistance of counsel before submitting to a pretrial psychiatric interview:

"The Sixth Amendment, made applicable to the states through the Fourteenth Amendment, provides that '[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence.' The 'vital' need for a lawyer's advice and aid during the pretrial phase was recognized by the Court nearly 50 years ago in *Powell v. Alabama*, 287 U.S. 45, 57, 71 [53 S.Ct. 55, 59, 65, 77 L.Ed. 158] (1932). Since then, we have held that the right to counsel granted by the Sixth Amendment means that a person is entitled to the help of a lawyer 'at or after the time that adversary judicial proceedings have been initiated against him . . . whether by way of formal charge, preliminary hearing, indictment, information, or arraignment.' *Kirby v. Illinois*, 406 U.S. 682, 688–689 [92 S.Ct. 1877, 1881–1882, 32 L.Ed.2d 411] (1972) (plurality opinion); *Moore v. Illinois*, 434 U.S. 220, 226–229 [98 S.Ct. 458, 463–465, 54 L.Ed.2d 424] (1977).

" . . .

"Here, respondent's Sixth Amendment right to counsel clearly had attached when Dr. Grigson examined him at the Dallas County Jail, and their interview proved to be a 'critical stage' of the aggregate proceedings against respondent. See *Coleman v. Alabama*, 399 U.S. 1, 7–10 [90 S.Ct. 1999, 2002–2003, 26 L.Ed.2d 387] (1970) (plurality opinion); *Powell v. Alabama*, supra [287 U.S.] at 57 [53 S.Ct. at 59]. Defense counsel, however, were not notified in advance that the psychiatric examination would encompass the issue of their client's future dangerousness, and respondent was denied the assistance of his attorneys in making the significant decision of whether to submit to the examination and to what end the psychiatrist's findings could be employed." (Footnotes omitted).

In the instant case, the record fails to reflect that appellant was afforded an opportunity to consult with counsel prior to the examination by Coons. At the time of the examination, Bailey had filed a complaint against appellant charging him with the capital murder of Drummond. The record reflects that counsel was appointed on the day after Coons interviewed appellant. We conclude that Coons' testimony was admitted in violation of appellant's right to the assistance of counsel as provided by the Sixth and Fourteenth Amendments to the United States Constitution and Art. I, Sec. 10 of the Texas Constitution.

Having determined that Coons' testimony was erroneously admitted, we must determine whether the error requires reversal. The test for harmless constitutional error is not whether the conviction could have been had without the improperly admitted evidence, but whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction. *Clemons v. State*, Tex.Cr.App., 605 S.W.2d 567; *Esquivel v. State*, Tex.Cr.App., 595 S.W.2d 516.

We find it of significance to note that Coons was the only witness presented by the State during the punishment phase of the trial. The circumstances of the capital offense itself, if severe enough, can be sufficient to support an affirmative finding as to the probability of future acts of violence. While the offense herein was of an extreme brutal nature, the issue we must confront is not whether the facts of the crime, standing alone, would support the finding, but whether the testimony of Coons might have contributed to the jury's verdict during the punishment phase. We conclude that there was a reasonable possibility that Coons' testimony might have contributed to the jury's verdict during the punishment phase of appellant's trial. The erroneous admission of Coons' testimony requires a reversal of appellant's conviction. See *Holloway v. State*, Tex.Cr.App., 613 S.W.2d 497.

In his eleventh ground of error, appellant contends the evidence is insufficient to support the jury's affirmative finding that there is a probability that he would commit criminal acts of violence that would constitute a continuing threat to society. Art. 37.071(b)(2), supra. He maintains that "excluding the inadmissible psychiatric testimony of Dr. Coons, there is insufficient evidence in the record to support the death penalty."

The situation here presented is not unlike that before this Court in *Collins v. State*, Tex.Cr.App., 602 S.W.2d 537. There, the defendant was convicted of rape of a child with hearsay evidence being relied upon to prove penetration. It was urged that in view of the trial error in admitting the hearsay evidence, the evidence remaining, absent the hearsay, was insufficient to support the defendant's conviction. The Court declined the defendant's request to review the sufficiency of the evidence and stated:

"Having found error and made the determination that it is reversible, we should simply reverse the judgment of conviction and remand for a new trial if the State be so advised, without undertaking to examine appellant's contention that the evidence is insufficient to convict. What evidence? That error-tainted evidence which the jury heard and obviously considered or that which remains after the contamination is metaphysically eliminated? The former manifestly will not do and the latter becomes an exercise in the abstract—"forming conclusions for ourselves" is the way the court put it more than 120 years ago in *Draper v. State* [22 Tex. 400 (1858)].

"In pursuing such a fanciful endeavor we do an injustice to the State, for necessarily it must be assumed what could well be absolutely contrary to the case: that the prosecuting attorney mustered, assembled and laid before the jury all evidence known and available to him. We torture the rights of appellant as well, for he is entitled to have his fate decided by a jury upon competent evidence under proper instructions from the trial court. For this Court to award appellant the acquittal he desires on 'insufficient' evidence without assurance that the State has exhausted its resources—and this record surely does not provide it—thwarts the quite valid public concern that the guilty be punished. Yet, to affirm his conviction on spoiled evidence serves neither the criminal justice system nor the constant effort to inform its participants of errors that must be corrected."

As noted above, appellant urges that absent Coons' testimony, the evidence is insufficient to support the jury's affirmative finding on special issue number two. We find that appellant's eleventh ground of error need not be addressed.

The recent holding of the United States Supreme Court in *Estelle v. Smith*, supra, dictates that the admission of Dr. Coons' testimony at the punishment stage of the trial constituted violations of appellant's rights under the Fifth, Sixth and Fourteenth Amendments to the United States Constitution and requires that the judgment be reversed and cause remanded.

## OPINION

### ON MOTION FOR REHEARING

ROBERTS, Judge.

On original submission we reversed the conviction in this case because of error in

the admission of testimony at the punishment stage of the appellant's trial. We granted leave to both the appellant and the State to file motions for rehearing. For reasons which follow, we overrule both motions for rehearing, but now affirm the judgment of the trial court.

The appellant's motion for rehearing alleges that there was error in the guilt-innocence stage of the trial which should have been addressed in the original opinion in this case. Specifically, in four grounds of error, he contends that his confession was inadmissible.

In order to better understand the appellant's contentions we set out briefly the facts of the case.[1] On the evening of March 3, 1978, the appellant abducted a young woman from the parking lot of a shopping center in Austin. He subsequently raped her several times and then stabbed her to death. During this time the appellant and the deceased had been in her car. After the appellant had killed the young woman he attempted to remove all his fingerprints from her car. He also attempted to remove all her blood from his clothing and from the knife he had used to kill her. He then began walking from the location where the murder had taken place to the shopping center where he had originally abducted her in order to return to his truck. As the appellant walked along the frontage road of I–35 in Austin on his way back to the shopping center, Officer Pena of the Austin Police Department stopped the appellant because he fit the general description of a suspect in a robbery which had occurred about one-half hour earlier. When Pena asked the appellant to approach the police car, the appellant attempted to hide the knife he had used to kill the young woman. He threw the knife into the weeds about ten feet from where he was standing. Pena recovered the knife and noticed that it had stains which appeared to be either rust or blood. These stains would not rub off. When he questioned the appellant, Pena was unable to obtain a satisfactory explana-

tion for the appellant's presence there, but did satisfy himself that the appellant was not the person sought for the robbery. He then released the appellant.

The young woman's body was discovered late that evening or early the next morning. The next day, Pena informed the officer in charge of the murder investigation, Lt. Napier, of the circumstances of the stop. Since the stop was made in the general area where the deceased and her car were found, at about the time when the investigation showed the murder had occurred, and since the appellant had attempted to rid himself of a knife and had been evasive about his reasons for being at that location at that time, Napier decided to investigate further.

As it happened, Napier knew the appellant socially. On March 5, Napier and another police officer drove to the appellant's home. At about 8:00 p. m., Napier asked the appellant to accompany them to the police station for questioning about his March 3 confrontation with Pena. He did not place the appellant under arrest, and, in fact, advised him that he was free to leave at any time. On the way to the police station in Napier's police car, Napier advised the appellant that he was working on a murder investigation and wanted the appellant to clear up a few things about his presence and actions on March 3. Napier told the appellant that he wanted to check the appellant's fingerprints, that he wanted the appellant to give him the knife he had tried to dispose of on March 3, that he would like a reasonable explanation of why the appellant was found at that location on that night, and that he wanted the appellant to identify the person he had told Pena he had been with earlier on the night of March 3.

Shortly after their arrival at the Austin police station about 8:30, the appellant provided Napier with a set of his fingerprints. They then began a general discussion of the murder. Again Napier told the appellant that he was free to leave.

1. Our rendition of the facts is based upon the appellant's confession, and upon the two hearings held in this case concerning the admissibility of the confession.

About 10:00 p. m., a fingerprint examiner informed Napier that the appellant's fingerprints matched a print taken from the dead woman's car. Napier then placed the appellant under arrest and gave him a set of warnings. During the course of the next three hours, the appellant confessed to the murder and rape. At about 1:00 a. m., the appellant signed a typed statement. At about 4:30 a. m., he was taken before a magistrate and given the warnings required by V.A.C.C.P., Art. 15.17.

Two hearings were held concerning the admissibility of the appellant's written statement. The first was held before the trial began; the second was held during the trial, but outside the presence of the jury. Each time the trial judge ruled the statement was admissible.

■ The appellant contends that this written statement is inadmissible because it was the product of an illegal seizure and detention. He argues that he was seized at his house on less than probable cause. We need not decide whether the police officers had sufficient probable cause to arrest the appellant. The evidence in this record shows that the appellant was not seized until he was formally arrested at the police station after his fingerprints were found to match those found at the murder scene.

The trial court found that the appellant voluntarily accompanied the two police officers to the police station. It further found that Napier informed the appellant that he was free to leave at any time. The appellant was never told that he could not leave until he gave the police officers the information they desired. He was not told that he could not leave until he gave them a fingerprint exemplar. In view of all the circumstances surrounding the incident, we conclude that a reasonable person would have believed that he was free to leave. See *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980) (Opinion of Justice Stewart).

■ The facts of this aspect of the case are virtually identical to those found in *Moore v. State,* 542 S.W.2d 664 (Tex.Cr.

App.1976), and *Jones v. State,* 522 S.W.2d 470 (Tex.Cr.App.1975). In each of those cases, also capital murder cases, the defendant was asked to accompany police officers to the police station. Each voluntarily agreed to do so. Each consented to be fingerprinted. Finally, after his fingerprints were found to match those taken at the scene of the crime, each defendant was arrested. Although in each of those cases, the defendant was a possible suspect at the time the police officers asked him to go to the police station, in each case the evidence showed that the defendant did so voluntarily. For this reason the confession each defendant subsequently gave was not found to be the product of an illegal detention. We find these cases to be controlling on this aspect of this case. The appellant's fourth ground of error is overruled.

The appellant argues that the teachings of *Dunaway v. New York,* 442 U.S. 200, 99 S.Ct. 2248, 60 L.Ed.2d 824 (1979), require reversal of this case. We do not agree. In *Dunaway,* the defendant was seized without probable cause as part of a dragnet round-up of suspects. The Court reversed the conviction because the statements the defendant made were the product of an illegal seizure. In *Dunaway* it was clear that the defendant was "seized." Although he was not told that he was under arrest, he was transported to the police station in a patrol car and kept in an interrogation room. He was never told he was free to leave.

In this case, the appellant was told from the outset that he was free to leave. As discussed above, for Fourth Amendment purposes, the appellant was not "seized" until after his fingerprints were found to match those at the crime scene at about 10:00 p. m. Only then was the appellant no longer free to leave the presence of the police officers. For this reason, *Dunaway* is inapplicable to the present case.

■ The appellant also contends that his confession was inadmissible because his request for the assistance of counsel was not "scrupulously honored." *Michigan v. Mosley,* 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313 (1975). We overrule this contention. We

find that the appellant never made a request for the assistance of counsel.

During the time between the appellant's arrival at the police station about 8:30 p. m. and his arrest at 10:00 p. m. the appellant and Napier discussed this offense in general terms. During this discussion, the appellant's right to counsel was also discussed. Napier told the appellant that he had the right to have an attorney, that he could call any attorney he wished to call, and that he would be furnished a telephone book to obtain names of attorneys. Although the appellant indicated that he understood that an attorney might affect his decision as to what he should do, he made no attempt to contact an attorney, nor did he in any way attempt to end the conversation until an attorney could advise him.

In *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Supreme Court stated,

"If [a defendant] indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning. Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him."

384 U.S. at 444–445, 86 S.Ct. at 1612. We realize that in *Miranda*, the Court held that these rights attach during questioning initiated by law enforcement officers "after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.* at 444, 86 S.Ct. at 1612. As set out above, the appellant was not in custody until after 10:00 p. m. However, even if we were to assume that the appellant's rights under *Miranda* had aris-

en, we find that he never indicated in any manner or in any way that he wished to consult an attorney or that he wished to end the conversation. For this reason, we overrule the appellant's third ground of error.

■ The appellant next contends that because the warnings given the appellant at the time of his arrest were inadequate under *Miranda* and under V.A.C.C.P., Art. 38.-22, his subsequent confession was inadmissible. Specifically, he contends that he was not advised of his right to remain silent and of his right to the assistance of counsel prior to and during any questioning. Upon our review of the entire record in this case we conclude that, although the appellant was not advised of these rights in the precise words of Art. 38.22, he did receive the functional equivalent.

We have thus far discussed events before the appellant's arrest. We now turn to events after his arrest. The testimony clearly shows that when the appellant's fingerprints were found to match the fingerprints found in the deceased's car, the appellant was formally arrested. At that point a reasonable person would have believed he was no longer free to leave.

Immediately after informing the appellant that he was under arrest, Napier gave the appellant a set of warnings. He then questioned the appellant for approximately three hours. During that time, Napier reduced to writing the appellant's responses. Napier's handwritten rendition of the appellant's statement was then typed onto a form which contained at its top the warnings required by V.A.C.C.P., Art. 38.22.[2] At about 1:20 a. m., two civilian employees of the Austin Police Department witnessed the

2. The typewritten form stated:

"At 10:00 pm AM/PM, on the 5th day of March, 1978, at 700 E. 7th, prior to making the following statement, I, George Edward Clark was warned by Lt. Roger Napier, to whom this statement is made, that: (1) I have the right to have a lawyer present to advise me prior to any questioning and during any questioning concerning the accusation made against me, (2) that if I am unable to employ a lawyer I have the right to have a lawyer appointed to counsel with me prior to and during my questioning, (3)

that I have the right to terminate this interview at any time, and (4) that I have the right to remain silent and not make any statement at all and that any statement I make may be used in evidence against me at my trial.

"I fully understand all of my rights as stated above but I do hereby freely and voluntarily state that I do not want a lawyer and wish to make the following statement in writing without any threats or promises of any kind having been made to me:"

appellant's reading and signing of the two written statements. At about 4:30 a. m., after the appellant had consented to have his house searched and had accompanied Napier and another officer while they searched his house, the appellant was finally taken before a magistrate and was given the warnings required by V.A.C.C.P., Art. 15.17.

At the pre-trial hearing, Napier was questioned about the warnings that the appellant received:

"Q [By the prosecutor]: Prior to the time that these warnings were given [by the magistrate at 4:30 a. m.], had anybody else given George Edward Clark any warning?

"A [By Lt. Napier]: Yes.

"Q And when was that?

"A I gave him a complete peace officer's warning at approximately 10:00 P.M. on the evening prior.

"Q Which would have been what day—March 5th?

"A Yes.

"Q At approximately 10:00 A.M.?

"A 10:00 P.M.

"Q At 10:00 P.M. you gave him the peace officer's warning?

"A Yes, sir.

"Q All right, sir. Where did you get the peace officer's warning you gave him?

"A Where did I get it?

"Q Yes, sir.

"A I did not read it—just from memory.

"Q Would you state the warning you gave Mr. Clark?

"A Exactly the statement.

"Q Would you state it the way you gave it to him at the time?

"A I will try as near as possible as I did at the time.

"Q Yes, sir.

"A I informed him, first of all, he was not required to make any statement to me or anyone else; number two, that he did have a right to have an attorney and, if he could not afford an attorney, he could have an attorney appointed for him by the Court. He was also informed that he did not have to give any handwriting specimen or take any polygraph examination, and that if in fact he decided to talk with us he could terminate any interview at any time he desired to do so. And he was also informed at that particular time there was not any charge, formal charge, filed against him; and, in the event there was one filed, he would be made aware of that.

"Q Did you advise him anything regarding making any statement to you?

"A If he did in fact give a statement, he was informed that that could be used in court against him.

\* \* \* \* \* \*

"Q Lt. Napier, I hand you what has been marked for identification purposes as State's Exhibit No. 3; have you seen that item before?

"A Yes, I have.

"Q Is that the typewritten copy of the handwritten statement that you made as a result of your conversation with Mr. Clark?

"A That is correct.

"Q And what is contained on the top of it—what is this?

"A It's a typed warning form, very similar to the one administered by the Judge, and also the warning I gave the defendant prior to taking the statement.

"Q It has the magistrate's warning on the top?

"A That is correct."

At the same hearing, the officer was further questioned on cross-examination:

"Q Lt. Napier, I want to make sure I understand a couple of things you said fully. I believe it was your testimony that the first warning you gave to the defendant, the accused, George Clark was at 10:00 at the time that he made the statement; is that correct?

"A That was the first time that he was given a complete peace officer's and magistrate's warning, warning of his entire constitutional rights.

"Q Okay. Had he at any time before that, before 10:00, requested, inquired in any way as to whether he could have an attorney or what his rights were concerning an attorney?

"A Did he make any mention of an attorney; yes, he did.

"Q What was that mention?

"A He asked if in fact he had a right to an attorney, and he was informed that he did have, and he was further informed he could call any attorney he wanted to and I would furnish him with a phone book to obtain names. He did not make any further inquiry.

"Q Now, the warnings that you gave at 10:00, were those the warnings that are on the typed confession?

"A Yes.

"Q Was there any warning given before the handwritten confession, the handwritten statement that has been ＿＿＿

"A Both statements were taken after 10:00 when the warning was given . . . ."

On re-direct examination at the same hearing, the following occurred:

"Q Lt. Napier, I got kind of lost in all the shuffle, but there was something you said earlier when you related the warning, the warning you gave the defendant at 10:00; you said you told him he had a right to have counsel, that he could terminate the interview at any time, that if he couldn't afford an attorney that an attorney would be appointed for him by the Court, and that he could look in the phone book if he wanted one; is that correct?

"A A little out of context. What I said was, if he wanted an attorney, that he could have one at that time, and that I would furnish him with a

phone book to call one. I further said if he could not afford an attorney, that arrangements could be made with the Court to appoint him an attorney."

At trial, Napier was again asked about the warnings he gave the appellant:

"Q At any time did you read him a magistrate's warning?

"A Was he given a warning?

"Q Yes, sir.

"A Yes, sir, at a later time he was given a peace officer's warning.

"Q Approximately what time?

"A I would say right at 10:30 P.M., in that vicinity.

"Q All right, sir. And did you administer him such warning?

"A Yes, sir, I did.

　　*　　*　　*　　*　　*　　*

"Q All right, sir. And I believe you said when you placed him under arrest, you gave him the peace officer's warning?

"A Yes, sir, I did.

"Q Would you relate to the jury what you warned him?

"A First, like I said, I did inform him he was under arrest for suspicion of murder. I further informed him he did have the right to have an attorney, he had the right to have that attorney present at all times whether he was being interviewed by myself or anyone else. He was also told he did not have to make any statement, he did not have to take a polygraph examination, nor did he have to give a sample of his handwriting. He was also informed that if in fact he did decide to talk, he could at any time terminate any interview he had with myself or anyone else. In addition to that, he was informed if he felt he could not afford any attorney, that arrangements could be made through the court for him to be furnished with an attorney.

"Q    Did you warn him anything concerning the use of any statement he might make?

"A    Yes, sir.  In reference to giving any statement he might give, he was told any such statement he made could and probably would be used in court against him."

On this record, we conclude that the appellant was adequately advised of his right to remain silent and of his right to the assistance of counsel prior to and during any questioning.  Although Napier's initial testimony at the pre-trial hearing does not include the specific warning of the right to remain silent, in the context of the conversation and in light of his later testimony we conclude that the right to remain silent was conveyed by the warning that "if he decided to talk with us he could terminate any interview at any time he desired to do so."  To the parties, the coupling of the right "not to make a statement" with the right to "terminate any interview at any time" if the appellant "decided to talk with us" adequately conveyed the right to remain silent.

With regard to the right to the assistance of counsel prior to and during any questioning, the discussions which preceded the formal warnings at 10:00 p. m. included the offer by Napier of a phone book to call an attorney at that time.  In addition, Napier's trial testimony specifically included the statement that he had advised the appellant that he had the "right to have an attorney, he had the right to have that attorney present at all times whether he was being interviewed by myself or anyone else."  This adequately conveyed to the appellant the right to have an attorney present prior to and during any questioning.

■■    Since we conclude that the appellant was warned of his rights in compliance with Art. 38.22 and *Miranda*, we overrule the appellant's motion for rehearing.  The simple practice of reading to a defendant the warnings set out in the statute would eliminate the problem of non-compliance with the precise warnings set out in *Miranda*.  There may well be a case presented to us in which a police officer, attempting to give the warnings from memory, fails to adequately convey the required warnings.  We might well have a different view of such a case, for, as this Court has made clear, the sufficiency of the warnings required by *Miranda* and Art. 38.22, and the voluntariness of the waiver of the rights protected by those warnings are two distinct and separate requirements which must be met for a confession to be admissible.  *Faulder v. State*, 611 S.W.2d 630 (Tex.Cr.App.1979); *Ochoa v. State*, 573 S.W.2d 796 (Tex.Cr.App.1978).  Without the predicate of proper warnings, even a voluntary confession is inadmissible.

For this reason we once again caution that the warnings required by Art. 38.22 should be read prior to any questioning.  Alternatively, the defendant should be promptly taken before a magistrate to receive the warnings set out in Art. 15.17 prior to any questioning.  Either procedure would eliminate the problem of non-compliance with the teachings of *Miranda*, and would reduce the time and energy expended by both trial courts and this Court in determining after the fact whether "close is good enough."

■    The State's motion for rehearing asks us to reform the appellant's sentence to confinement for life under the provisions of V.A.C.C.P., Arts. 44.24 and 44.251.  This we need not do.  After we delivered our original opinion in this case, the Governor issued a proclamation which commuted this sentence to life imprisonment.  Since the imposition of the death penalty is no longer possible, if there was no error in the guilt-innocence phase of the trial, the judgment will be affirmed.  *Rodriguez v. State*, 626 S.W.2d 35 (Tex.Cr.App.1981); *Wilder v. State*, 623 S.W.2d 650 (Tex.Cr.App.1981); *Adams v. State*, 624 S.W.2d 568 (Tex.Cr.App.1981); *Whan v. State*, 485 S.W.2d 275 (Tex.Cr.App.1972).  We now find it necessary to address the appellant's remaining grounds of error which contend that there was error during the guilt-innocence phase of his trial.

The appellant complains of the admission at trial of photographs of the deceased. Nine photographs were of the deceased at the scene of her murder. Six photographs were of the deceased as she appeared just prior to the performance of an autopsy.

In *Harrington v. State*, 547 S.W.2d 621 (Tex.Cr.App.1977), we stated the general rule concerning the admission of photographs.

"If a photograph is competent, material and relevant to the issues on trial, the photograph will not be inadmissible because it is gruesome, unless it is offered solely to inflame the minds of the jury. If a verbal description of the body and the scene would be admissible, a photograph depicting the same is admissible. Only when the probative value of the photograph is very slight and the inflammatory aspects great will it be an abuse of discretion to admit the photographs. *Martin v. State*, 475 S.W.2d 265 (Tex.Cr. App.1972); *Page v. State*, 532 S.W.2d 341 (Tex.Cr.App.1976); *Provost v. State*, 514 S.W.2d 269 (Tex.Cr.App.1974)."

547 S.W.2d at 625–626.

■ Officer Thompson of the Austin Police Department testified that the nine photographs of the deceased at the scene of the murder accurately depicted the scene as he found it on the evening the deceased's body was found. At the time the photographs were identified and offered into evidence, Thompson had already testified about what he had observed at the scene of the crime. The photographs were, therefore, admissible.

Dr. Bucklin performed the autopsy on the deceased. He identified the other six photographs as an accurate depiction of the deceased just prior to the autopsy. He then testified concerning the extent and nature of the deceased's wounds.

The appellant relies upon *Terry v. State*, 491 S.W.2d 161 (Tex.Cr.App.1973), and *Goss v. State*, 549 S.W.2d 404 (Tex.Cr.App.1978). Both cases are inapposite. In *Terry*, the photographs which were held to be inadmissible were taken after an autopsy had been performed. They depicted "massive mutila-

tion of the subject matter caused by the surgery in performing the autopsy." 491 S.W.2d at 164. In the present case, the photographs were taken before the surgical procedures were performed.

In *Goss*, certain pictures taken in connection with an autopsy were held to be inadmissible because they had not been identified as an accurate portrayal of facts relevant to the issues involved in the autopsy. In other words, the proper predicate for their admission had not been laid.

In *Bailey v. State*, 532 S.W.2d 316 (Tex. Cr.App.1975), we upheld the admission of photographs which accurately depicted the deceased before an autopsy was performed. We held:

"*Terry* [*v. State*, supra] cannot be construed to prevent the admission of relevant photographs merely because the deceased has been removed to clinical surroundings. Cf. *Knoppa v. State*, Tex.Cr. App., 505 S.W.2d 802. Only where the results of surgery have obfuscated the results of the crime will otherwise accurate depictions be inadmissible. The photographs here in question illustrated and clarified the doctor's description of the injuries, and no error is reflected in their admission. *Provost v. State*, Tex.Cr.App., 514 S.W.2d 269."

532 S.W.2d at 321–322.

■ We find *Bailey* to be controlling. The photographs of the deceased, which were properly authenticated by the doctor who performed the autopsy, and which depicted the deceased as she looked before the doctor performed the autopsy, were admissible. The ground of error is overruled.

Finally, the appellant contends that the trial court erred in admitting hearsay testimony from one witness during the guilt-innocence phase of the trial. During the State's case-in-chief, Brenda Hofstad was called as a witness. She testified that on the night before the murder she was working in a gift shop in the shopping center from which the deceased was abducted. The appellant had entered her shop and,

over the course of about an hour's time, had tried to get her to go out with him and go drinking or smoke "pot". When she refused, he left the store in a very "bad mood". Hofstad was then asked by the State whether she had been contacted by a private investigator shortly after the murder occurred. She replied that she had. The prosecutor then asked, "Did that investigator relate who he was working for?" After the trial court overruled the appellant's objection that the answer would be hearsay, Hofstad testified that the investigator told her he worked for the appellant.

■■■ In light of the overwhelming evidence of the appellant's guilt in this case, we conclude that error, if any, in the admission of this testimony was harmless beyond a reasonable doubt. The ground of error is overruled.

We have now found that there was no reversible error in the guilt-innocence phase of the appellant's trial. The judgment is now affirmed.

CLINTON, Judge, dissenting on Motions for Rehearing.

My views concerning an executive commutation of a death sentence after that penalty has been judicially vacated constituting an impermissible violation of the

constitutional doctrine of separation of powers are expressed in *Adams v. State,* 624 S.W.2d 568 (Tex.Cr.App.1981) and *Rodriguez v. State,* 626 S.W.2d 35 (Tex.Cr. App.1981), and will not be reiterated here, though they are the backdrop against which I now state the reasons I do not join in the judgment of the Court.

Briefs before the Court in, e.g., *Ex parte Giles,* 502 S.W.2d 774 (Tex.Cr.App.1974) and *State ex rel Smith v. Blackwell,* 500 S.W.2d 97 (Tex.Cr.App.1973), will reflect my professional aversion to the notion of the meaning of the term "after conviction" in Article IV, § 11 of the Constitution of the State of Texas so ponderously justified in the opinion on rehearing in *Snodgrass v. State,* 67 Tex.Cr.R. 615, 150 S.W. 162 (1912), and so casually restated in *Goss v. State,* 107 Tex.Cr.R. 659, 298 S.W. 585 (1927)—in the latter, I am constrained to note, without the slightest attribution to the former.[1] But I need not discuss all the internal inconsistencies in the *Snodgrass* opinion which flaw its conclusion that in Texas "conviction" is "the *verdict* of guilty" found by a jury[2] for it begat *Whan v. State,* 485 S.W.2d 275 (Tex.Cr.App.1972) on which the Court continues to rely.

However, the situation we confront here is that the *judgment* of the trial court assessing the death penalty had been reversed

---

1. *Goss v. State,* supra, cites for its only Texas authority *Duke v. State,* 106 Tex.Cr.R. 154, 291 S.W. 539 (1927), which likewise ignores *Snodgrass.* See also the companion case, *Snodgrass v. State,* 67 Tex.Cr.R. 648, 150 S.W. 178 (1912); the opinion for the Court was written by another judge who finds the first suspended sentence law unconstitutional on somewhat different rationale and for other reasons.

Moreover, in both *Duke* and *Goss* the statement of the notion is dicta, for in each pardon and commutation, respectively, came after entry of judgment by the trial court and while the case was on appeal—indeed, in *Duke* judgment of affirmance had been entered. On account of executive clemency each appeal was dismissed by the Court. The ruling of this Court today must mean that no longer is either *Duke* or *Goss* viable authority or that each is limited to its own facts to the theory that acceptance of executive clemency by an appellant moots his appeal.

2. Pausing only to observe that the *Snodgrass* court first painstakingly demonstrates fundamental departures from the common law were taken by constitutional and statutory provisions adopted by the several jurisdictions in this country and in Texas, id., 150 S.W. at 170–171, but then insists that they retained the common law concept of "after conviction" in the same provisions, id., 150 S.W. at 172–174, I point out that the very statute the Court said gave the term its common law meaning, former Article 688 in the 1857 Code of Criminal Procedure, then Article 861 of the 1911 code and now part of Article 42.07, V.A.C.C.P., Reasons to prevent sentence, presupposes that a *judgment* has been entered. Article 42.02, V.A.C. C.P.; *Thornton v. State,* 576 S.W.2d 407, 408 (Tex.Cr.App.1979). (All emphasis is mine unless otherwise indicated.)

707

by this Court *before* the Governor issued a proclamation purporting to commute a nonexistent "sentence" to life imprisonment.[3] Thus, as I demonstrated with constitutional and statutory law in *Adams v. State*, supra, there was and still is nothing for the Governor to commute, and it is on that basis that I find the purported commutation has no effect on the appellate proceedings in the Judicial Department.[4]

To some degree the majority seem willing to ward off attempted intervention by the Executive Department in Judicial Department business—at least long enough to examine the guilt-innocence stage of a trial for reversible error. What the majority does today means to me that an appellant

3. Notwithstanding the awkward terminology of Article 37.071(f), V.A.C.C.P.—"The judgment of conviction and *sentence of death* shall be subject to automatic review by the Court of Criminal Appeals..." Article 42.04, V.A.C. C.P. controls, so that when appeal is taken from a death penalty the sentence of death "shall not be pronounced, but shall be suspended until the decision of the Court of Criminal Appeals has been received." *Hughes v. State*, 562 S.W.2d 857, 859 (Tex.Cr.App.1978); *Hovila v. State*, 532 S.W.2d 293, 297 (Tex.Cr.App. 1976).

4. On remand from the Supreme Court of the United States the Court affirmed the judgment of conviction in *Adams v. State*, 624 S.W.2d 568 (Tex.Cr.App.1981) on the solitary basis of *Whan v. State*, supra, and, in rejecting my dissenting views, propounded a theory that in light of the "sequence of events" the purported commutation "granted" Adams "reached the punishment before the judicial sequence did, and it is left with no death penalty upon which to exercise its power," *Adams*, supra, at 569. As we now see though, even that theory—essentially approving a footrace between the Judicial Department and the Executive Department to reach "the punishment" first—is abandoned by the majority. It concedes to the loser of the race.

On original submission a unanimous Court concluded:

"The recent holding of the United States Supreme Court in *Estelle v. Smith*, supra, dictates that the admission of Dr. Coon's testimony at the punishment stage of the trial constituted violations of appellant's rights... and requires that the judgment be reversed and remanded."

The inevitable consequence of our reversal for that "trial error" and remand for a new trial is

may resist the gratuitous act of clemency and insist that the Court consider his grounds of error attacking validity of his conviction for the offense of capital murder and, notwithstanding a purported commutation of "sentence," this Court will proceed to review those grounds of error to the end that should reversible error be found a new trial will be granted and the cause remanded—with the death penalty, I presume, still viable punishment.[5] However perplexing it may be that the commutation order preempted further judicial proceedings in *Adams*, but in this cause is "suspended" pending judicial decision, I applaud the Court in retaking a bit of its jurisdiction, power and authority in capital cases.

that the death penalty remained in the case as a possible punishment.

The opinion on original submission was delivered September 23, 1981; the commutation order is dated November 9, 1981, and thus purports to commute what was by then a nonexistent judgment assessing punishment at death. As in *Rodriguez v. State*, 626 S.W.2d 35 (Tex.Cr.App.1981), once again interruption by the Executive Department of "the judicial sequence" has eliminated possible imposition of capital murder.

5. Implicit in the refusal of the Court to reform the "sentence" (but see note 3, supra) to life— "This we need not do ... [because] the Governor issued a proclamation which commuted *this sentence* to life imprisonment."—but nevertheless to proceed to go behind the verdict of guilt to examine the record for trial error is that should reversible error dictate that judgment of conviction based on the verdict of guilt be set aside, the assessment of punishment portion of the same judgment would also fall. Surely, the Court will not permit a purported commutation to fix a ceiling on available punishment if another verdict of guilt be returned after a new trial. My formulation may be wrong, however, since both *Snodgrass* and *Whan* and their progeny hold that clemency effectively attaches any time after a verdict of guilt, *Whan* opining that "imposition of the death penalty is no longer possible by virtue of the commutation" which, the *Whan* Court said, "merely mitigates the punishment which *can* be given." *Id.*, at 277. Perhaps the answer is that *Whan* is limited to the situation where judgment of conviction must be affirmed because no trial error, e.g., *Cherry v. State*, 488 S.W.2d 744, 758 (Tex.Cr.App.1972); if so, then the *Snodgrass* definition is irrelevant.

Still, I dissent to the judgment of the Court.

ONION, P. J., and TEAGUE, J., join.