**Cornell ROBERTS, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 58222.**

Court of Criminal Appeals of Texas, Panel No. 2.

Dec. 12, 1979.

anxious for a speedy hearing on the revocation motion, although there are remedies to encourage the same.

W. B. "Bennie" House, Jr., Houston, for appellant.

Carol S. Vance, Dist. Atty., Calvin Hartmann and Kay Burkhalter, Asst. Dist. Attys., Houston, Robert Huttash, State's Atty., Austin, for the State.

Before ODOM, TOM G. DAVIS and CLINTON, JJ.

## OPINION

CLINTON, Judge.

This is an appeal from a conviction for the offense of murder wherein the jury assessed appellant's punishment enhanced by a prior felony conviction under the ambit of V.T.C.A. Penal Code, § 12.42(c), at confinement in the Texas Department of Corrections for a term of twenty years.

At the outset, we are met with the contention that the trial court erred in failing to submit a charge on the lesser included offense of voluntary manslaughter after the evidence fairly raised the issue. We agree with appellant and, accordingly, reverse the judgment below.

The record reflects that Officers Berryman and Nelson were dispatched to 3514 Beulah in Houston in response to a shooting "call." Upon arriving at the residence, Berryman asked appellant what had happened. Appellant pointed to the deceased lying on the floor and responded that "he [the deceased] was going to go to the kitchen to get a knife, so I went to the bedroom and got my shotgun. And when he came out, I shot him." Appellant was thereafter placed under arrest and given his *Miranda* warnings.

Mrs. Lula Douglas, appellant's common law wife, testified that appellant and the deceased, her son, spent the entire evening consuming some two cases of beer between them [1] and, from time to time, arguing. The nature of the argument surrounded what the deceased felt was an effort by appellant to procure the deceased's wife for appellant's brother and of appellant allegedly being the cause of the deceased having lost both his wife and his pickup truck in the not too distant past. She was out of their presence, however, during events preceding the shooting.

Appellant testified during the offense stage of the trial, recounting the nature and quality of the recurring argument between him and the deceased, particularly the fact that the latter continually told appellant, "Old man, I will get you for causing me to lose my wife and pickup." Appellant also noted that he had had trouble of this sort with the deceased on more than one past occasion, as had other persons who had been the object of his violent temperament.

---

1. There were conflicting opinions expressed by the two arresting officers as to whether appellant was intoxicated at the time of his arrest. Though one agreed with defense counsel that appellant was "under the influence," the other did not, though he admitted that appellant was a little high. Autopsy reports showed that the deceased was intoxicated at the time of his death.

As midnight approached Mrs. Douglas left to fetch a second case of beer. She returned to find the argument still in progress. At some point the deceased picked up a standing metal ash tray and threatened appellant with it; Mrs. Douglas admonished her son and took the ash tray from him and put it back in its place. After she left the room, suddenly the deceased told appellant that he was going to get a knife and fix him, and left in the direction of the kitchen.[2] Appellant ran to his bedroom,[3] got his shotgun and was returning to the living room when he saw the deceased coming out of the kitchen "pretty fast." Appellant testified that at that juncture he felt that the deceased could and would carry out his past threats and that he was in fear of serious physical harm and death.[4] He fired at the deceased one time, striking him in the breastbone and killing him. Appellant then returned to the living room with the shotgun and sat down.[5]

The trial court submitted the issue of self-defense to the jury but declined, over appellant's timely objection, to submit a requested charge on voluntary manslaughter. The jury then returned a verdict of guilty of the only offense submitted to them, namely murder.

■ It was formerly settled that where evidence fairly raises the issue of voluntary manslaughter, and the charge is properly requested, the court is bound to submit such issue to the jury and the failure to do so is reversible error. *Ray v. State*, 515 S.W.2d 664 (Tex.Cr.App.1974). Indeed, as this Court noted in *Ray*:

"The testimony of the defendant alone is sufficient to raise the issue [of voluntary manslaughter] and, once it is raised, the court, without determining the weight or the truth or falsity of the testimony is bound to submit the issue for jury determination. [cites omitted] Where the issue of [voluntary manslaughter] is raised by the evidence, the fact that the evidence also raises the issue of self-defense and the accused is granted [the] requested instruction on the same does not deprive the accused of his right to an instruction on [voluntary manslaughter]."

*Id.* at 667.

Testimony in *Ray*, supra, showed that the complainant attacked the defendant which led the latter to fear for his life, and this Court held that the issue of assault with intent to commit murder without malice [under our former Penal Code] was raised. The Court has reached the same conclusion in a multitude of cases involving similar fact situations under former penal codes. See, e. g., *Armentrout v. State*, 515 S.W.2d 297 (Tex.Cr.App.1974); *Monroe v. State*,

2. As appellant described it, the deceased "broke for the kitchen."

3. Right at this point the prosecuting attorney seems to have understood and probably correctly characterized the situation in her next question:

"Q: There was nothing that prevented you simply from walking out the front door and walking around the block until *tempers cooled off*; was there?"

4. After appellant testified that he did not see whether the deceased actually obtained and was armed with a knife from the kitchen, came the following testimony:

"Q: Are you telling us that you didn't take time to find out before you fired whether or not he had a knife?
A: When a person is that close and coming out of the kitchen and already threatened, who is going to take time?
Q: You didn't take time?

\*     \*     \*     \*     \*     \*

A: No."

Also, he testified that the arrangement of the house and its egresses were such that he could not retreat because he had "nowhere to go."

5. As soon as the shot was fired and standing near him, Mrs. Douglas asked appellant why he had shot the deceased, but did not get an answer. Appellant sat down in the living room, he testified, to "try to get myself together." Another Douglas son, who lived nearby and was called just after the shooting, arrived to see appellant "just sitting there," and testified that he did not offer any explanation for his actions. In a written statement made some three hours later, portions of which he later recanted in his testimony, appellant is reported to have said, "After I got my gun, I really don't know what happened, except that I shot him." It also states that upon reloading the shotgun his wife yelled, "Don't shoot him any more," but appellant testified that she actually uttered, "You don't have to do that."

501 S.W.2d 639 (Tex.Cr.App.1973); *Lewis v. State*, 89 Tex.Cr.R. 345, 231 S.W. 113 (1921).

V.T.C.A. Penal Code, § 19.04 defines the offense of voluntary manslaughter as follows:

"(a) A person commits an offense if he causes the death of an individual under circumstances that would constitute murder under Section 19.02 of this code, except that he caused the death under the immediate influence of sudden passion arising from an adequate cause.

(b) 'Sudden passion' means passion directly caused by and arising out of provocation by the individual killed or another acting with the person killed which passion arises at the time of the offense and is not solely the result of former provocation.

(c) 'Adequate cause' means cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection." [6]

Presently the Court continues to be instructed by cases decided under the former manslaughter statutes, *McCartney v. State*, 542 S.W.2d 156, 160 [7] (Tex.Cr.App.1976), and the governing principle is stated to be: "The charge on voluntary manslaughter is mandatory only when there is evidence that the defendant acted under the immediate influence of sudden passion arising from an adequate cause." *Cerda v. State*, 557 S.W.2d 954, 958 (Tex.Cr.App.1977). As *Luck v. State*, 588 S.W.2d 371 (Tex.Cr.App. 1979) and *Medlock v. State*, 591 S.W.2d 485 (Tex.Cr.App.1979) demonstrate, however, application of the principle depends upon the particular facts of the cause.

In *Luck* the Court could not find evidence which would raise the issue of voluntary manslaughter, pointing out that at no time did Luck, who did not testify, indicate in his statement recounted by a police officer, "that he was in fear of the deceased." *Medlock*, on the other hand, particularly notes her testimony that when the deceased came toward her, saying he was going to get her, "I was scared. I didn't have nowhere to run . . . It was my life or Medlock's," and with other circumstances found "sufficient evidence was presented in this case to raise the issue that the appellant may have acted under the immediate influence of sudden passion."

■ On the point of contrast between *Luck* and *Medlock* the instant case easily comes within the purview of *Medlock*. The gist of the testimony of appellant, supported in some degree by that of his wife, is that, although the tide of the argument rose and ebbed during the late hours, by midnight the deceased had once moved to threaten him with a metal ash tray, desisting only by restraint of his mother, and then subsequently in her absence from the room combined words and deeds that caused appellant to fear for his person and his life and to provoke him into action. Factually, the essential ingredients are similar to those in *Ray*, supra, that "evidenced an immediate act of the injured party that caused the appellant's agitated state of mind and provoked the shooting," 515 S.W.2d at 667. And, as in *Ray*, we are unable to say that the acts of the deceased here were not adequate cause for sudden passion as a matter of law. The issue was a factual one for determination by the jury. *Id.*

---

**6.** In *McGee v. State*, 473 S.W.2d 11, 15 at n. 1 (Tex.Cr.App.1971) (Odom, J., dissenting), the following definitions from Webster's Dictionary appear: "Anger is the general term for the emotional reaction of extreme displeasure and suggests neither a definite degree of intensity, nor an outward manifestation; rage implies loss of self-control from violence of emotion; resentment is a feeling of indignant displeasure at something regarded as a wrong, insult, or injury; and terror is a state of intensive fear."

To apply these definitions in the context of this case is to achieve the eventual result with little difficulty.

**7.** ". . . [S]aid § 19.04 is a blend of the old and the new, and cases decided under former Article 1257c, as enacted in 1927, and those decided earlier under the former manslaughter statute are instructive in deciding the case before us."

The failure of the trial court to submit the charge on voluntary manslaughter left the jury with only the alternatives of finding appellant guilty of murder or freeing him. See *London v. State*, 547 S.W.2d 27, 29 (Tex.Cr.App.1977). The law does not insist that an accused so situated suffer such extreme options when he points to a more moderate choice which may be made available. Because the trial court, though aware of it, did not provide it,[8] the ground of error must be sustained.

For these reasons and the error found the judgment is reversed and the cause remanded.

---

8. Indeed, in his second ground of error, appellant contends that the trial court commented on the weight of the evidence in that testimony of two jurors at the hearing on the motion for new trial revealed that they and at least half of the jury overheard the trial judge tell his clerk shortly before he submitted the jury charge that the instant case, "looks like a case of voluntary manslaughter." Given our disposition of appellant's first ground of error, we need not reach the question of whether the jurors' testimony regarding their discussion of this comment and their dilemma of wanting to find appellant guilty of an offense which they could not possibly do, given the lack of a charge on voluntary manslaughter, poses reversible error—albeit a purported attempt at "impeaching" their verdict. We pause merely to note that the trial court's comments only added further confusion to a markedly muddled situation regarding voluntary manslaughter and that such a comment was clearly uncalled for where, as here, it reached the ears of a jury shortly before their deliberations as to an accused's guilt or innocence in a closely contested case.