**Johnny Paul PENRY, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 68882.**

Court of Criminal Appeals of Texas, En Banc.

Jan. 9, 1985.

Rehearing Denied May 1, 1985.

John E. Wright, Huntsville, for appellant.

Joe L. Price, Dist. Atty. and Hugh M. Barton, Asst. Dist. Atty., Groveton, Robert Huttash, State's Atty., Austin, for the State.

## OPINION

TOM G. DAVIS, Judge.

Appeal is taken from a conviction for capital murder. Trial was in Trinity County following change of venue from Polk

County. After finding appellant guilty of capital murder, the jury returned affirmative findings to the three special issues under Art. 37.071(b), V.A.C.C.P. Punishment was assessed at death.

Appellant was convicted of murdering P_____ C_____, a married female, on October 25, 1979, by stabbing her with a pair of scissors "in the course of committing and attempting to commit the offense of aggravated rape" of the said victim.

In his first ground of error, appellant complains that the trial court erred by failing, after timely objection, to instruct the jury on the law of voluntary manslaughter.

Appellant did not testify at trial. His two written confessions, Exhibits 47 and 48, were introduced into evidence by the State. Both confessions indicate that appellant forced his way into the deceased's house, grabbed her around the neck, and held his open pocket knife to her throat. After a struggle during which appellant hit the deceased, knocked her to the floor, and shoved her against a stove causing her face to bleed, the deceased stabbed the appellant with some scissors.

Appellant knocked the scissors out of the deceased's hands. He dragged her into the bedroom. After kicking and hitting her repeatedly and "stomping" her once, appellant had intercourse with the deceased for thirty minutes. Appellant next retrieved the scissors from where they had landed, sat on the deceased, and stabbed her in the chest with the scissors.

■ Appellant contends that the foregoing facts and the following statement from the second confession raise the issue of voluntary manslaughter: "It was while I was f____ing her that I decided to kill her with the scissors since she stabbed me with them."

In his first confession appellant related the following: "I went on and f____ed her on the bedroom floor and then after I got through I got up and walked over to the kitchen door where the scissors had landed and picked them up. I walked back to her and got down on her. *I sat down on her stomach and I told her that I loved her and hated to kill her but I had to so she wouldn't squeal on me.*" (Emphasis added.)

In his second confession appellant related the following: "During the last 3 weeks I thought about the Chick [deceased] a lot. Then on the morning of October 25, 1979, which was yesterday, I got up and went to town somewhere around 8 or 9 a.m. I saw a girl in City Hall who reminded me of the Chick. I decided I would go over to the Chick's house and get me a piece. I also wanted to get the money that she had in her purse. *I knew that if I went over to the Chick's house and raped her that I would have to kill her because she would tell who I was to the police and I didn't want to go back to the pen.*" (Emphasis added.)

Further on in the confession appellant stated: "I came back and sat on her stomach. *I told her that I was going to kill her and that I hated to but I thought she would squeal on me.*" (Emphasis added.)

V.T.C.A. Penal Code, Sec. 19.04, states: "Sec. 19.04. Voluntary Manslaughter.

(a) A person commits an offense if he causes the death of an individual under circumstances that would constitute murder under Section 19.02 of this code, except that he caused the death under the immediate influence of sudden passion arising from an adequate cause.

"(b) 'Sudden passion' means passion directly caused by and arising out of provocation by the individual killed or another acting with the person killed which passion arises at the time of the offense and is not solely the result of former provocation.

"(c) 'Adequate cause' means cause that would commonly produce a degree of anger, rage, resentment, or terror in a person of ordinary temper, sufficient to render the mind incapable of cool reflection.

"(d) An offense under this section is a felony of the second degree."[1]

Appellant clearly failed to raise the issue of voluntary manslaughter under our case law. Nowhere in either confession or elsewhere does appellant indicate that he was acting under "the immediate influence of sudden passion" when he killed the deceased or that he was motivated by "anger, rage, or resentment."

In *Luck v. State*, 588 S.W.2d 371 (Tex.Cr. App.1979), we found no error in the trial court's refusal to charge on voluntary manslaughter even though the deceased had gone over to the appellant's house and hit and stabbed him prior to being shot by the appellant. In *Roberts v. State*, 590 S.W.2d 498 (Tex.Cr.App.1979), discussing *Luck*, we noted: "In *Luck* the Court could not find evidence which would raise the issue of voluntary manslaughter, pointing out that at no time did Luck, who did not testify, *indicate* in his statement recounted by a police officer, 'that he was in fear of the deceased.'" (Emphasis added.)

In the instant case, not only is there no *indication* of appellant's "anger, rage, resentment, or terror," but the facts are far less suggestive of such phenomena than they were in *Luck*.

In *Luck*, the deceased initiated the difficulties leading to his death by going over to the appellant's house with a gun and assaulting appellant. Here, the evidence shows unequivocally that appellant initiated the entire criminal episode leading to the deceased's death, and that appellant had committed an aggravated rape of the deceased before he killed her.[2] Appellant's first ground of error is overruled.

In his second ground of error, appellant complains that State's Exhibit No. 47 (his confession to Officer W.F. Smith) was improperly admitted over timely objection, in that the warnings typed on the confession were not in compliance with Art. 38.22, Sec. 2, V.A.C.C.P.[3]

Specifically, appellant complains of the typed warning on the confession, "(1) that I have a right to have a lawyer present to advise me *either prior to any questioning or during my questioning;* (2) that if I am unable to employ a lawyer I have the right to have a lawyer appointed to *counsel* with me *prior to or during any questioning* ...*"* (Emphasis added.)

Art. 38.22, supra, literally speaks of the right to have a lawyer "advise" the accused and speaks of the right to a lawyer, "prior to *and* during any questioning." (Emphasis added.)

1. Appellant asked for and received a jury instruction on the lesser included offense of murder.

2. It is difficult to imagine a factual situation in which sudden passion can arise from an "adequate cause" under Sec. 19.04, supra, when a defendant is in the course of committing one of the underlying offenses delineated in V.T.C.A. Penal Code, Sec. 19.03(a)(2). See *Smith v. State*, 323 S.W.2d 443 (Tex.Cr.App.1959); *Leza v. State*, 195 S.W.2d 552 (Tex.Cr.App.1946); W. LaFave & A. Scott, Jr., Criminal Law, Sec. 76 (1972).

3. Art. 38.22, Sec. 2, supra, reads in part as follows:
"...
"Sec. 2. No written statement made by an accused as a result of custodial interrogation is admissible as evidence against him in any criminal proceeding unless it is shown on the face of the statement that:
"(a) the accused, prior to making the statement, either received from a magistrate the warning provided in Article 15.17 of this code or received from the person to whom the statement is made a warning that:
"(1) he has the right to remain silent and not make any statement at all and that any statement he makes may be used against him at his trial;
"(2) any statement he makes may be used as evidence against him in court;
"(3) he has the right to have a lawyer present to advise him prior to and during any questioning;
"(4) if he is unable to employ a lawyer, he has the right to have a lawyer appointed to advise him prior to and during any questioning; and
"(5) he has the right to terminate the interview at any time; and
"(b) the accused, prior to and during the making of the statement, knowingly, intelligently, and voluntarily waived the rights set out in the warning prescribed by Subsection (a) of this section."

Appellant contends that the discrepancy between the typed warnings and the statute constitutes a violation of the terms of the statute and renders the confession inadmissible.

We confronted a similar problem in *Eddlemon v. State*, 591 S.W.2d 847 (Tex.Cr. App.1979). There, as in the instant case, the language typed on the confession did not precisely track Art. 38.22, supra, but, "All of the rights listed in that statute were included in the warning given to appellant by the police." *Eddlemon v. State*, supra at 850.

A warning which conveys on the face of the statement, in only slightly different language, the exact meaning of the statute is sufficient to comply with the statute. We see no substantive distinction between the words "advise" and "counsel" as used in the context of these warnings.

Further, we reject appellant's complaint that by using the phrase, "prior to *or* during any questioning" the State in effect informed appellant that he did *not* have the right to an attorney "prior to *and* during any questioning." (Emphasis added.) While it would have been the better practice to track the current statute precisely, this apparently inadvertent retention of the former statutory language did not harm the appellant. See also *Darden v. State*, 629 S.W.2d 46 (Tex.Cr.App.1982).

Appellant contends that the requirement of a showing *on the face* of the statement that appellant knowingly, intelligently and voluntarily waived the rights set out in the warnings was not met. The last paragraph of the confession contains the following language: "I further affirm that I knowingly, intelligently and voluntarily waived the above rights prior to and during the making of this statement." Appellant's contention is without merit.

Appellant also asserts that Art. 38.-22, Sec. 2(A), supra, has not been complied with since the confession did not adequately show that the accused received the proper magistrate's warning provided in Art. 15.17, V.A.C.C.P. We need not reach this issue. Under the provisions of Art. 38.22, supra, the face of the statement must show that the accused received the magistrate's warning *or* the proper warning from the person who took the statement. Since we have held that the printed warning on the confession received from the officer who took the statement was adequate under Art. 38.22, supra, the question of whether the recitation of the magistrate's warning was adequate is rendered irrelevant. Appellant's second ground of error is overruled.

In his third ground of error, appellant complains that the typed warning on his first confession was invalid under *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Appellant incorporates by reference his arguments as to ground of error number two. In addition, appellant notes that the typed warning administered by Officer Smith did not state that appointed counsel would be *present*, but rather stated that appointed counsel would "counsel with" appellant.

In the recent case of *California v. Prysock*, 453 U.S. 355, 101 S.Ct. 2806, 68 L.Ed.2d 696 (1981), the United States Supreme Court, faced with a similar issue, stated:

"This Court has never indicated that the 'rigidity' of Miranda extends to the precise formulation of the warnings given a criminal defendant ...

"Quite the contrary, Miranda itself indicated that no talismanic incantation was required to satisfy its strictures. The Court in that case stated that 'the warnings required and the waiver necessary in accordance with our opinion today are, *in the absence of a fully effective equivalent,* prerequisites to the admissibility of any statement made by a defendant.' " 453 U.S. at 359, 360, 101 S.Ct. at 2809. See also *Collins v. State*, 548 S.W.2d 368 (Tex.Cr.App.1976) cert. denied, 430 U.S. 959, 97 S.Ct. 1611, 51 L.Ed.2d 811 (1977).

Appellant was warned that he had, "the right to have a lawyer present to advise me either prior to any questioning or during

my questioning," and that, if unable to afford a lawyer, he had, "the right to have a lawyer appointed to counsel with me prior to or during any questioning."

We could only agree that this portion of the warning did not satisfy *Miranda* if we agreed with appellant that it had the effect of telling him he could *not* have a lawyer both prior to *and* during questioning. We reject such an interpretation.

Further, the record indicates that appellant was taken to a magistrate no more than forty-five minutes before Officer Smith gave him his warning and began taking his statement, and was informed by the magistrate of his right to have a retained or appointed attorney, "*present* prior to *and* during any interview and questioning ..." (Emphasis added.) Appellant's third ground of error is overruled.

▇ In his fourth ground of error, appellant contends that his first written confession was the product of an illegal arrest and search and was thus improperly admitted.

Billy Ray Nelson is a deputy sheriff in Polk County. He testified that he was riding patrol with Deputy Bob Grissom the morning of October 25. The officers received a radio report describing a suspect in a possible stabbing and rape case being investigated by the Livingston Police Department. Nelson thought the description fit appellant who he knew had been recently paroled from the Texas Department of Corrections on a rape conviction.

Upon finding appellant at home, Nelson informed him of the situation and asked him if he knew anything about it. Appellant replied that he did not. Nelson asked appellant if he would mind going with Nelson to talk to the officers investigating the case. Appellant said he would go if the officers brought him back home when they finished.

Appellant rode in the backseat of the sheriff's car which was unlocked. Nelson testified that appellant was not under arrest. He was not searched, patted down, or handcuffed, which was Nelson's normal procedure when arresting a suspect.

Nelson testified that he would not have arrested appellant if he had refused to come or if he had run. Nelson further stated that he did not think he had probable cause to arrest. Appellant followed the officers to the patrol car.

The officers drove to the Livingston Police Department and while outside met Ted Everitt, the investigator for the district attorney's office. Nelson had radioed Everitt and told him he had someone he wanted Everitt to talk to.

Everitt testified that as soon as he walked up to appellant he read him his "Miranda rights" from a card. Everitt said this was a normal precautionary procedure he took, especially when he did not know a person's involvement in a case.

As the appellant was talking to Everitt, Grissom noticed blood in plain view on the back of appellant's shirt. Everitt testified that he asked appellant if appellant would permit him to look at his back. Appellant removed his shirt.

The officers noticed two small puncture wounds on appellant's back. He said he had fallen off of a bicycle earlier that morning and a stick had cut him in the back. Appellant's shirt had no holes in it. Appellant said the shirt he had been wearing was back at his house.

Everitt asked appellant if he would go get the shirt and give it to the officers. Appellant agreed and signed a consent to search form. The form also contained standard *Miranda* warnings.

The officers and appellant proceeded to appellant's house. Once again, appellant was not handcuffed, searched, or restrained in any way. At this time, Everitt had not been to the deceased's house.

After obtaining appellant's shirt, Everitt asked him if he would mind accompanying Everitt to the deceased's house so that Everitt could talk to him further after conducting his on-scene investigation. Everitt testified that, "we didn't know what we

had" at the time. A Livingston police officer was "holding" the crime scene for him.

Appellant agreed to go if Everitt promised that the officers would not, "try to hang something on him that he had not done." Everitt assured appellant that this would not happen. Everyone proceeded to the crime scene. Appellant continued to ride with Nelson and Grissom.

At the victim's house, Nelson parked nearby while Everitt went inside. Appellant remained in the backseat of the patrol car. One of the back doors was open and he was under no restraint. Occasionally Nelson and Grissom would walk away from the car to look for tracks. Once they went into the backyard, out of sight of the car, for five to ten minutes. They also went up the road looking for tracks.

After thirty or forty minutes, as Nelson walked back to the car, appellant tried to talk to Nelson. Appellant said, "Billy, I've got something I want to tell you." Nelson told appellant to be quiet. Appellant said, "No, I want to get it off my conscience. I done it and I want to get it off my conscience."

At this point Nelson advised Grissom to place appellant under arrest. Grissom read appellant his *Miranda* warnings while Nelson went into the deceased's house to inform Everitt of what happened.

Appellant was taken inside the house where he made a brief oral confession. Testimony as to what appellant said inside the house was never admitted before the jury. Appellant was taken to the police department and brought before the magistrate.

Appellant now contends that he was under arrest when, "Nelson and Grissom confronted him bearing visible guns and badges and in a marked car, inside his home." Alternately, he contends he was under arrest when the officers noticed his bloody shirt. Since the arrest was illegal, appellant's confessions were the fruits of the illegal arrest, as was the discovery of the shirt he was wearing when he murdered the deceased.

Appellant's arguments are without merit. The facts in issue are similar to those found in *Clark v. State*, 627 S.W.2d 693 (Tex.Cr.App.1981), *Moore v. State*, 542 S.W.2d 664 (Tex.Cr.App.1976), and *Jones v. State*, 522 S.W.2d 470 (Tex.Cr.App.1975). As in *Clark, Moore,* and *Jones,* appellant was asked to accompany the police officers and voluntarily did so. Appellant, like suspects Clark, Moore and Jones, was questioned during the investigative stage of police activity. Even after blood was discovered on appellant's back he was not restrained in any way and was *asked* to accompany the officers and allow a search. The evidence revealed that prior to his confession appellant was free to leave and was treated as if he was free to leave.

Appellant was not arrested until he confessed to Nelson that, "I done it." Appellant's fourth ground of error is overruled.

In his fifth and eighth grounds of error appellant contends that the trial court erred in admitting into evidence the consent to search form appellant signed. Appellant's theory is evidently that his signature on the form was obtained as the result of his illegal arrest. Since we have held that appellant was not under arrest at this juncture, this contention is without merit.

In his sixth and seventh grounds of error, appellant complains that the trial court erred in admitting into evidence copies of the *Miranda* warning cards used by Grissom and Everitt when they read appellant his warnings. This evidence should not have been admitted because, "it reflected that appellant's oral and written statements were taken illegally." The cards "reflected" this because they contained the wording complained of in grounds of error two and three.

Since the wording complained of was not violative of *Miranda* or Art. 38.22, supra, appellant's argument must fail.

■ Appellant contends in his ninth ground of error that his statement to Nelson that, "I done it," should not have been admitted into evidence since it was the result of an illegal arrest or, alternately,

was an oral admission made while in custody. As explained in ground of error number four, appellant had not been arrested at all when he made the statement in question. It was the making of the statement that prompted his arrest. Ground of error nine is overruled.

Appellant next complains that his western shirt was illegally seized and admitted into evidence. This same contention was raised as part of appellant's fourth ground of error. It is without merit.

■ In his eleventh ground of error, appellant contends that the trial court erroneously admitted into evidence a photograph of his back showing the scars the deceased put there in an attempt at self-defense. No objection was made at trial to this evidence. Nothing is presented for review. *Esquivel v. State*, 595 S.W.2d 516 (Tex.Cr. App.1980).

In his twelfth ground of error, appellant complains that the court erred by admitting into evidence Exhibit 48, appellant's second written confession. This confession was given to Texas Ranger Maurice Cook on October 26. Specifically, appellant contends that since his first confession was illegally obtained, "there is a presumption that the same force which produced the prior statement was still in motion." As noted above, appellant's first written confession was legally obtained. Appellant's twelfth ground of error is overruled.

In his eighteenth ground of error, appellant asserts that the trial court erred by admitting the testimony of Cindy Gail Peters that the deceased told her over the telephone, "I've been stabbed and raped."

In his nineteenth ground of error, appellant complains of the trial court's failure to instruct the jury to disregard deceased's statement to Peters.

The deceased's mother called deceased on the morning of October 25, between 9:00 and 9:30. Her daughter was fine at the time. Peters, the deceased's friend, received a call from the deceased at "around 10:00 in the morning." Peters did not know who was calling and asked, "Who is this?" The deceased said, "This is Pam. I've been stabbed and raped. Mother's at the church. Help me and hurry."

Peters arrived at the deceased's house within ten minutes. She found the deceased lying on the bed, covered with blood. The deceased was moaning. Peters ran to a neighbor, Becky Buller, for help. Peters and Buller returned and called the police. Peters testified that the time period between her receipt of the deceased's call and the notification of the police was about 15 minutes. Buller testified that the police were called between 10:15 and 10:30 a.m.

E.C. Page, the police officer answering the initial call, stated that he received the radio report in his car at 10:26 a.m. The deceased "looked bad" to him and appeared to be in pain. She had blood, "bubbling out of her mouth."

Dr. Edward Bruce McClendon was on duty in the emergency room when the deceased was brought in. He described the injuries generally as consisting of a stab wound to the chest, bruises around the eye, marks on the neck, abdomen and left side.

He testified, outside of the jury's presence, that, "Obviously, she [the deceased] was in the grip and under the influence of the injuries. I mean, you know, she died an hour later. There was no way she ever left the grip of the injury ..." He also testified that her injuries were recent, occurring within 30 minutes of her arrival at the hospital.

Dr. Jack Pruitt, the pathologist performing the autopsy, testified that the deceased had a bruise on her left eye, strangulation-type marks on the neck, a bruise on the left side of the chest about the size of a man's shoe heel, a bruise on the right hip, and a stab wound going 2½ inches into the right lung. Her left kidney had ruptured and bled excessively. The stab wound was the primary cause of death.

Appellant contends that the complained of statement was hearsay and therefore inadmissible under State law. Further, the admission of the statement purportedly violated his right to confrontation under the

Sixth Amendment to the United States Constitution. The State responds that the statement was "res gestae and an exception to the hearsay rule," and therefore admissible.

As we said in the recent case of *King v. State,* 631 S.W.2d 486, 491 (Tex.Cr. App.1982), "[I]t is a well recognized exception to the general prohibition against hearsay evidence, that statements made while in the grip of violent emotion, excitement or pain, and which relate to the exciting event, are admissible under the rationale that the capacity for reflection necessary to the fabrication of a falsehood is lost." Further, "Such statements may be admissible even ... after an appreciable time has elapsed between the infliction of the injury and the making of the statement." *Martinez v. State,* 533 S.W.2d 20, 23 (Tex.Cr. App.1976).

Here, the evidence clearly indicates that the deceased was in the grip of violent pain when she called Peters and up until the time she died. There was no long lapse of time between appellant's attack on the deceased and her phone call to Peters. The deceased's mother called her and found her all right between 9:00 and 9:30 a.m. The deceased called Peters around 10:00 a.m. Appellant confessed to beating and kicking the deceased, then raping her for thirty minutes, and finally stabbing her with some scissors before fleeing.

The statement to Peters was admissible as a spontaneous exclamation. *King v. State,* supra; *Beam v. State,* 500 S.W.2d 802 (Tex.Cr.App.1973); *Ricondo v. State,* 475 S.W.2d 793 (Tex.Cr.App.1971). Even if the deceased's statement had not been admissible as "true res gestae" it would have been allowed in under the "outcry" theory.

Appellant's contention that his United States constitutional rights were violated by the admission of this statement must similarly fail. In *Ohio v. Roberts,* 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), the United States Supreme Court stated:

"[W]hen a hearsay declarant is not present for cross-examination at trial, the Confrontation Clause normally requires a showing that he is unavailable. Even then, his statement is admissible only if it bears adequate 'indicia of reliability.' Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception...." 448 U.S. at 66, 100 S.Ct. at 2539.

Here, the deceased was obviously unavailable, and the "spontaneous exclamations" exception to the hearsay rule, whether it be called that or "res gestae" or "excited utterances" is old and firmly rooted. Appellant's eighteenth and nineteenth grounds of error are overruled.

In grounds of error twenty through twenty-two, appellant complains that the trial court erred in admitting the testimony of Nurse Anne Carr that a substance on the deceased's vagina appeared to be semen.

Anne Carr was Director of Nurses at Livingston Memorial Hospital on the morning deceased was brought in. She assisted in the treatment of the deceased from the moment she was brought into the hospital until she died. Carr had been a nurse for twenty-one years. She was a registered nurse, had a bachelor's degree, and was three hours away from a master's degree. She had previously assisted with rape victims at the hospital and knew the procedures that were followed to obtain "slide smears" from the patients.

Carr was asked if she saw any evidence consistent with "the fact that [deceased] may have been raped." She replied, "There was a substance on the vagina that appeared to be semen." Appellant objected and the State agreed to rephrase the question.

Carr then described the substance as "a clear, viscous-looking substance on the genital area." Later she testified that the substance "appeared to be semen." No slide smears were ever made on the deceased. Right after Carr noticed the vis-

cous substance, blood came out of the vagina and the deceased's condition deteriorated. All efforts were concentrated on saving her life.

Appellant complains that Carr's answers constituted improper opinion testimony. Appellant cites no cases on this point.

This Court has long held that non-expert witnesses may testify that a given substance resembled blood. *Williams v. State,* 164 Tex.Cr.R. 347, 298 S.W.2d 590 (1956); *Parks v. State,* 108 Tex.Cr.R. 576, 2 S.W.2d 245 (1927); *Howard v. State,* 92 Tex.Cr.R. 221, 242 S.W. 739 (1922); *Belcher v. State,* 71 Tex.Cr.R. 646, 161 S.W. 459 (1913); *Diaz v. State,* 62 Tex.Cr.R. 317, 137 S.W. 377 (1911).

In some of these cases the non-expert was a person involved in medicine or law enforcement. See *Williams v. State,* supra. In others, the non-expert was a layman. See *Howard v. State,* supra.

The identification of blood by a non-expert witness is not precisely analogous to the identification of semen. Blood is more commonly seen and more easily distinguishable from other substances than is semen. Thus, we cannot hold that in all situations, all non-expert witnesses are allowed to identify a substance as one resembling semen.

This case, however, presents us with a much narrower proposition. The witness was an experienced nurse, a director of nurses, with special experience in the treatment of rape victims. In addition, the substance "appearing to be" semen was restricted to the deceased's genital area, thus enhancing the probability of correctly identifying the substance. Under these circumstances, the witness was qualified to testify that the substance on the deceased's vagina "appeared to be semen."

In further support of the above we note our cases holding that witnesses can testify to what they observed upon viewing a victim's "private parts." *Haley v. State,* 157 Tex.Cr.R. 150, 247 S.W.2d 400 (1952); *Griffith v. State,* 142 Tex.Cr.R. 559, 155 S.W.2d 612 (1941). Also, in *Walker v. State,* 150

Tex.Cr.R. 421, 201 S.W.2d 823 (1947), the testimony of a graduate student nurse was objected to under the theory that she was not an expert. In rejecting this contention we stated: "She was not expressing an opinion from hypothetical questions, but from actual observation of the patient in aiding the doctor in his treatment." 201 S.W.2d at 829. Appellant's twentieth, twenty-first and twenty-second grounds of error are overruled.

In grounds of error thirteen through fifteen, appellant contends that the evidence is insufficient to support the conviction, "even if the alleged oral admissions and written statements are considered as admissible evidence."

Appellant asserts that without, "the purported declaration of the decedent, as recited by Peters, there is no direct evidence of a rape, other than the two written statements .... While there is abundant direct evidence that a death occurred, there is no direct evidence connecting appellant with the death, other than the oral and written 'confessions.'"

The corpus delicti in a murder prosecution consists of two elements: (1) the body of the deceased must have been found and identified; (2) the death of the deceased must be shown to have been caused by the criminal act of another. *Self v. State,* 513 S.W.2d 832 (Tex.Cr.App.1974).

Proof of the corpus delicti may not be made by an extrajudicial confession alone, but proof of the corpus delicti need not be made independent of an extrajudicial confession. *Brown v. State,* 576 S.W.2d 36 (Tex.Cr.App.1978). If there is some evidence corroborating the confession, the confession may be used to aid in the establishment of the corpus delicti. *Valore v. State,* 545 S.W.2d 477 (Tex.Cr.App.1977). Moreover, the corroborating evidence can be circumstantial. *White v. State,* 591 S.W.2d 851 (Tex.Cr.App.1979).

In the instant case the corpus delicti consists of a victim whose death was caused by the criminal act of another in the course of committing or attempting to com-

mit rape. Appellant concedes that the deceased's body was found and identified.

In addition to appellant's two written confessions to the murder and rape of deceased and his oral confession that "I done it," the evidence consisted of:

(1) the pathologist's testimony that the primary cause of death was a stab wound to the deceased's chest;

(2) the deceased's spontaneous utterance to her friend that, "I've been stabbed and raped ...; "

(3) bloody scissors found at the scene;

(4) the deceased's statement at the hospital that, "the scissors are still in; "

(5) seminal stains and spermatozoa found on appellant's underwear[4] and "what appeared to be semen" on the deceased's vagina;

(6) testimony of the ambulance attendants that the deceased's panties were down just above her knees (consistent with appellant's statement that, "She kinda sat up and pulled her panties past her knees.");

(7) the deceased's description of a person who attacked her;

(8) a knife found at the scene;

(9) testimony, consistent with appellant's confession, that appellant installed a stove and a freezer at the deceased's house several days before the alleged crime;

(10) marks and bruises found on the deceased consistent with a criminal assault by another.

The evidence is sufficient to establish the corpus delicti.

The State, having established the corpus delicti, could prove the appellant's guilt as the agent guilty of the commission of the crime by his confessions unaided by other evidence. *Self v. State*, supra; *Gutierrez v. State*, 502 S.W.2d 746 (Tex.Cr.App.1973); *Brookins v. State*, 499 S.W.2d 320 (Tex.Cr.App.1973). Appellant's thirteenth, four-

teenth and fifteenth grounds of error are overruled.

In his sixteenth ground of error, appellant complains that the trial court erred in refusing to charge the jury on the law of circumstantial evidence. A charge on circumstantial evidence is no longer required. *Hankins v. State*, 646 S.W.2d 191 (Tex.Cr.App.1981).

In his seventeenth ground of error, appellant complains of the trial court's failure to charge that his confessions had to be corroborated. When the corpus delicti is established by other evidence, no such charge is necessary. *Honea v. State*, 585 S.W.2d 681 (Tex.Cr.App.1979); *Aranda v. State*, 506 S.W.2d 221 (Tex.Cr.App.1974). No error is shown.

In his twenty-fifth and twenty-sixth grounds of error appellant complains that the trial court erred in admitting the testimony of one Julia Armitage at the punishment hearing. Armitage testified concerning an attempted aggravated rape committed against her. The State sought to show that appellant was responsible for this extraneous offense.

Appellant contends that the State did not prove he was the perpetrator of the attempted aggravated rape. After Armitage testified at the punishment hearing, appellant asked for a mistrial on the same theory now urged on appeal. Before the trial court could rule on the motion the State offered to "follow-up" Armitage's testimony. The court then "overruled and denied" appellant's motion for mistrial.

The proper method of pursuing an objection until an adverse ruling is obtained is to (1) make an objection; (2) request an instruction to disregard; and (3) move for a mistrial. *Fuentes v. State*, 664 S.W.2d 333 (Tex.Cr.App.1984); *Koller v. State*, 518 S.W.2d 373 (Tex.Cr.App.1975). Here, by moving for a mistrial without first objecting to the testimony, appellant put the trial court in the position of either

---

**4.** Testimony as to the seminal stains and spermatozoa was given by Patricia Lux, a forensic serologist at the Department of Public Safety.

accepting the testimony as it stood or declaring an immediate mistrial. Appellant deviated from our longstanding rules on preserving error.

■ After his motion for mistrial was denied, appellant asked for an instruction to disregard. Appellant never received a ruling on his request. Defense counsel must obtain an adverse ruling in order to preserve error. *Bryant v. State*, 570 S.W.2d 921 (Tex.Cr.App.1978).

■ The State next proceeded to "connect-up" Armitage's testimony by introducing two of appellant's confessions, one of which was admitted into evidence and one of which was kept out. Though there were similarities between the attack Armitage testified to and an extraneous attempted rape the appellant confessed to, there were differences as well. Nevertheless, appellant never urged or reurged any objection to Armitage's testimony. Generally, nothing is preserved for review in the absence of an objection. *Esquivel v. State*, 595 S.W.2d 516 (Tex.Cr.App.1980). Appellant's twenty-fifth and twenty-sixth grounds of error are overruled.

In grounds of error twenty-three and twenty-four appellant asserts that the trial court erred by admitting psychiatric testimony as to appellant's future dangerousness obtained in court-ordered psychiatric examinations in which appellant and his counsel were not notified in advance that such examinations would encompass the issue of appellant's future dangerousness or that any statement appellant made could be used against him at a capital sentencing proceeding. Appellant cites *Estelle v. Smith*, 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981).

Dr. Kenneth Vogtsberger and Dr. Felix Peebles are the two psychiatrists who testified as to appellant's future dangerousness at the punishment hearing.

On November 12, 1979, the appellant was arraigned in open court with his attorney present. In response to an inquiry from the court, appellant and his attorney informed the trial court that appellant had been a patient in mental institutions, had received psychiatric treatment, and could "just barely" read and write. The trial court, acting pursuant to Arts. 46.02 and 46.03, V.A.C.C.P., ordered appellant to be examined by the Deep East Texas Regional Mental Health Mental Retardation Services on the issues of his competency to stand trial and his sanity at the time of the alleged offense.

The trial court granted both sides the right to submit supporting data to the examining psychiatrist and ordered them to furnish copies to opposing counsel. The examination was set for November 29.

The State forwarded its supporting data to the examining psychiatrist, Dr. Vogtsberger, and furnished copies to appellant's attorneys on November 28.

Dr. Vogtsberger's two written reports finding appellant competent to stand trial and sane at the time of the commission of the offense were filed with the trial court on December 10.

Appellant filed a motion to determine competency to stand trial and a notice of intention to raise the insanity defense on January 8, 1980. On February 25, appellant was examined by Dr. Jose Garcia, a psychiatrist appointed by the court at appellant's behest.

During the hearing to determine appellant's competency to stand trial, Dr. Jerome Brown, a clinical psychologist, testified in appellant's behalf on March 10.

On March 12, while the hearing to determine competency was in progress, the State filed a motion for appointment of a psychiatrist. Dr. Peebles was appointed by the court.

That same day, Vogtsberger and Peebles testified for the State as to appellant's competency to stand trial.

A jury found appellant competent to stand trial on March 13. At appellant's capital murder trial Dr. Garcia testified for the defense on the issue of appellant's insanity. Doctors Vogtsberger and Peebles testified in rebuttal for the State on the issue of insanity.

During the penalty phase of the trial, Dr. Peebles testified that appellant was "dangerous and does constitute a threat to society and will continue to do so, whenever he's free in society." Peebles based this testimony on his examination of appellant during the competency hearing in the instant case, on an examination as to appellant's competency and sanity Peebles made in a prior prosecution of appellant for the offense of aggravated rape, and on the basis of appellant's stay in a mental institution where Peebles practiced psychiatry in 1973.

Dr. Vogtsberger testified there was a high probability appellant "would commit criminal acts of violence that would constitute a continuing threat to society," and that appellant would be dangerous if released.

No objections whatsoever were made to the future dangerousness testimony of Peebles and Vogtsberger.

Before appellant presented testimony at the punishment stage he reoffered "all of the evidence heretofore given on the main trial on the guilt and innocence phase by the witnesses heretofore reduced, without the necessity of having to recall them."

During jury argument at the punishment stage, both of appellant's attorneys dwelt on appellant's mental condition and asked the jury to consider it in assessing punishment.

Attorney Wright stated:

"... I think also there's been a lot of evidence here about Johnny Paul Penry's mental condition and mental state. Certainly you have to believe that his mental state was not healthy. He's mentally ill. Certainly you know that his environment played a part in this. *Think about each of those special issues and see if you don't find that we're inquiring into the mental state of the defendant in each and every one of them ...*" (Emphasis added.)

Attorney Newman stated:

"... Now, we are called upon and you are called upon to assess punishment in this case. You know what the effect of the three issues will be in the event you answer yes ... Is there any pride to taking the life of any person, much less a person which the evidence has shown here was an afflicted child at the age of nine. The records reflect that this boy had an afflicted mind at the age of nine and we can't get around that ... And then, at the age of seventeen, we again find the condition of this boy as being mentally retarded, and even now, these doctors say he is mentally retarded ... But, a boy with this mentality, with this mental affliction, even though you have found that issue against us as to insanity, I don't think that there is any question in a single one of you juror's minds that there is something definitely wrong, basically, with this boy. And I think there is not a single one of you that doesn't believe that this boy had brain damage as they found it at the University of Texas, when they ran those tests and formed those conclusions ..."

Appellant complains that neither Peebles nor Vogtsberger warned him that any statements he made during their interviews with him could be used against him on the issue of future dangerousness at a punishment hearing.

In *Estelle v. Smith*, supra, the Supreme Court held that the admission of a doctor's testimony on the issue of future dangerousness, based on a pretrial psychiatric interview with a defendant in a death penalty case, violates a defendant's Fifth and Sixth Amendment rights when he has not been advised of his right to remain silent or that his statements can be used against him at a punishment hearing. But the Supreme Court stated in *Estelle*, supra, 451 U.S. at 465, 101 S.Ct. at 1874, that:

"When a defendant asserts the insanity defense and introduces supporting psychiatric testimony, his silence may deprive the State of the only effective means it has of controverting his proof on an issue that he interjected into the case. Accordingly, several Courts of Appeals have held that, under such circum-

stances, a defendant can be required to submit to a sanity examination conducted by the prosecution's psychiatrist."

In *Parker v. State*, 649 S.W.2d 46 (Tex. Cr.App.1983), cert. denied, —— U.S. ——, 104 S.Ct. 496, 78 L.Ed.2d 689 (1983), we relied on this language in holding that the introduction by a defendant of psychiatric testimony in order to raise an insanity defense constitutes a waiver of the defendant's Fifth Amendment privilege in the same manner as would the defendant's election to testify at trial.

We also stated that, "it would be absurd to hold that appellant waived his Fifth Amendment rights but he could still use the denial of his Sixth Amendment right to counsel to protect his Fifth Amendment right to prevent the State from using rebuttal testimony arising out of the flawed interview." *Parker v. State*, supra, at 53.

*Parker* involved a prosecution for burglary with intent to commit rape where the State introduced the testimony of a psychiatrist in rebuttal on the issue of insanity.

In the instant case appellant raised the issue of insanity at the guilt-innocence phase and reintroduced all of the guilt-innocence testimony at the punishment stage.

It is clear from the jury argument of appellant's attorneys that they wanted the jury to reconsider *all* of the testimony relevant to the *insanity defense* at the punishment stage, and wanted the jury to consider it as to "each of those special issues." It is also clear from a reading of the record that appellant's jury arguments and reintroduction of guilt-innocence phase testimony were not a response to the testimony of Peebles and Vogtsberger. Rather, throughout the entire trial, appellant relied heavily on his history of mental instability.

■ Since appellant raised the issue of insanity at the guilt-innocence stage of the trial *and at the punishment hearing* with respect to *all* of the special issues, including future dangerousness, he effectively waived his Fifth and Sixth Amendment rights to complain about the future dangerousness testimony of Peebles and Vogts-

berger, which testimony was based in part on psychiatric examinations of appellant during which insufficient warnings were given. The principle underlying *Parker* has been applied by this Court in a capital case, *Griffin v. State*, 665 S.W.2d 762, 769 (Tex.Cr.App.1983). Appellant's twenty-third and twenty-fourth grounds of error are overruled.

In his twenty-seventh ground of error, appellant complains of the trial court's refusal to grant a requested charge on voluntariness of the confession at the punishment stage.

■ Once a trial court has determined that a confession was voluntarily taken, there is no federal constitutional right to have the issue resubmitted to a jury. *Lego v. Twomey*, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972).

■ In Texas, the defendant does have the further right to have the issue of the voluntariness of a confession submitted to the jury. Art. 38.22, Sec. 6, V.A.C.C.P. See also Art. 38.23, V.A.C.C.P.

We reject, however, appellant's contention that he is entitled to an instruction on voluntariness at the penalty phase of a capital murder trial, where as here such issues had already been submitted at the guilt-innocence stage. Appellant's twenty-seventh ground of error is overruled.

In grounds of error twenty-eight through thirty appellant challenges the sufficiency of the evidence to support the jury's affirmative answers to the three punishment issues. See Art. 37.071, V.A.C.C.P.

Appellant bases his argument almost entirely on the purported inadmissibility of his two written confessions, a contention we have previously rejected.

■ With respect to special issue one, the evidence of deliberateness and reasonable expectation of death was overwhelming.

In his confession, appellant admitted to telling the deceased he was killing her so she would not "squeal" on him. He also confessed that he "knew that if I went over

to the Chick's house and raped her that I would have to kill her because she would tell who I was to the police and I didn't want to go back to the pen."

Portions of appellant's confessions read at the punishment stage show that he had been planning for months to rape somebody and that in the three weeks prior to the instant offense appellant had focused on the deceased and Jackie Howdeshell as possible victims. Appellant confessed that he "thought about raping" Howdeshell and broke into her house.

Howdeshell testified that her house had twice been broken into around the time of the instant offense when appellant was living close by. She also testified that appellant showed an interest in her and asked her to marry him.

Appellant's confession shows that he calmly and unhurriedly retrieved the deceased's scissors and plunged them into her after explaining why he had to kill her.

■ With respect to the second punishment issue, which focuses on the "probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society," the evidence is similarly strong.

In addition to the brutality of the offense for which appellant was charged, the State presented evidence that appellant had been convicted of a previous rape and indeed was on parole from that offense when he killed the deceased. Appellant also confessed to a burglary and attempted rape which confession was partially corroborated by the testimony of Julia Armitage. As noted earlier, appellant burglarized Jackie Howdeshell's home with the idea of raping her.

Doctors Peebles and Vogtsberger testified that appellant had an anti-social personality and would be a continuing threat to society. There was evidence of lack of remorse on appellant's part for the instant offense and previous ones. There was also ample evidence of appellant's failure to reform himself.

The evidence shows appellant to be an habitual rapist, quite willing to kill his victims, particularly those who give the least indication of resistance. Near the end of his second written confession appellant stated, "If it had not been the Chick I stabbed and killed, it would have been Jackie or some other Chick, but I don't think it would have been Jackie because she wouldn't have fought me."

■ The evidence that appellant's conduct was an unreasonable response to the victim's actions and that she did not provoke him was also substantial. The evidence reviewed in the discussion of special issue one was sufficient to allow a jury to find that appellant did not kill the deceased because she stabbed him with scissors in her resistance effort, causing superficial wounds. Further, the jury was free to find that *even if* the victim's resistance caused appellant to kill her, his actions in so doing did not constitute a reasonable response. The victim was within her rights in resisting an attack involving deadly force. Appellant deserved and was granted a jury instruction on special issue three. *Evans v. State*, 601 S.W.2d 943 (Tex.Cr.App.1980). But we reject his contention that the evidence of the deceased's resistance entitles him as a matter of law to an answer of "no" on that special issue. Appellant's twenty-eighth, twenty-ninth, and thirtieth grounds of error are overruled.

■ In grounds of error thirty through thirty-four, appellant complains of the trial court's failure at the punishment stage to define the following terms in the court's charge: deliberately; probability; criminal acts of violence; and continuing threat to society.

A contention identical to appellant's was considered and rejected in *King v. State*, 553 S.W.2d 105 (Tex.Cr.App.1977). *King* was reaffirmed in *Sanne v. State*, 609 S.W.2d 762 (Tex.Cr.App.1980). See also *Russell v. State*, 665 S.W.2d 771 (Tex.Cr. App.1983). *King* rests on the theory that:

"Where terms used are words simple in meaning themselves, and are used in their ordinary meaning, jurors are sup-

posed to know such common meaning and terms and under such circumstances such common words are not necessarily to be defined in the charge to the jury." *Joubert v. State*, 136 Tex.Cr.R. 219, 124 S.W.2d 368, 369 (Tex.Cr.App.1938).

We decline appellant's invitation to reverse *King* and its progeny. These grounds of error are overruled.

In his thirty-fifth ground of error appellant complains of the trial court's failure to grant a charge on circumstantial evidence at the punishment stage. As in ground of error sixteen, our decision in *Hankins v. State*, supra, disposes of this issue.

In ground of error thirty-six, appellant contends that the trial court erred in submitting to the jury at the punishment stage, over timely objection, a verdict form permitting assessment of the death penalty where the evidence showed appellant to be mentally retarded.

In ground of error thirty-seven, appellant complains that the trial court erred in failing to require, as a condition of the assessment of the death penalty, that the State show beyond a reasonable doubt that any aggravating circumstances found to exist outweighed any mitigating circumstances which existed in this cause.

In ground of error thirty-eight, appellant maintains that the trial court erred in failing to submit a charge to the jury at the punishment stage authorizing a discretionary grant of mercy based upon the existence of mitigating circumstances.

Appellant has grouped together grounds of error thirty-six through thirty-eight in his brief and has purportedly offered "argument and authorities" in support of each ground of error. In fact, appellant's arguments relate only to ground of error thirty-eight, concerning a discretionary grant of mercy, or a "concept of desert."

In *Adams v. State*, 577 S.W.2d 717 (Tex. Cr.App.1979), which was reversed on other grounds by the United States Supreme Court in *Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980), we specifically rejected the notion that Art. 37.071,

V.A.C.C.P. is unconstitutional because it does not contain any concept of "desert," or allow the jury to find that a defendant does not deserve to die.

■ Contrary to appellant's assertion, *Adams* dealt directly with the question of the statute's constitutionality in relation to its alleged failure to provide for jury lenience *after* all the special issues are answered affirmatively. Appellant's thirty-eighth ground of error is overruled.

■ With respect to ground of error thirty-seven, it has in effect been answered by the Supreme Court's opinion in *Jurek v. Texas*, 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976), upholding this State's statutory scheme for imposing capital murder. Our statutory scheme allows for broad consideration of aggravating and mitigating factors. V.T.C.A. Penal Code, Sec. 19.03 ensures that imposition of the death sentence is not even a possibility if certain aggravating circumstances are not proven beyond a reasonable doubt by the State.

Defendants are allowed to present all possible relevant mitigating information at the punishment hearing, as part of the effort to aid the jury in answering the special issues.

Defense counsel is allowed to argue against the death penalty in general, or its imposition in the particular case at hand in light of all relevant mitigating factors. In sum, the Texas death penalty scheme passes constitutional muster despite failure to require the jury to find that aggravating factors outweigh mitigating ones.

■ With respect to ground of error thirty-six, the evidence viewed in the light most favorable to the State did not unequivocally show appellant to be mentally retarded. Dr. Vogtsberger testified that based on his personal examination of appellant, he did not believe appellant to be mentally retarded.

■ Even if the evidence did unequivocally establish appellant's mild or moderate retardation, this alone does not render im-

position of the death penalty improper. See *Granviel v. Estelle*, 655 F.2d 673 (5th Cir.1981), cert. denied, 455 U.S. 1003, 102 S.Ct. 1636, 71 L.Ed.2d 870 (1981).

Appellant presented evidence of his retardation at the guilt-innocence and punishment stages and relied heavily on such evidence during the jury argument at the punishment stage. Evidence of appellant's mental status was relevant to all three special punishment issues. The jury had such evidence before it when it answered the special issues. Appellant's thirty-sixth ground of error is overruled.

In grounds of error thirty-nine through forty-two, appellant complains that the trial court erred in admitting testimony from various witnesses into evidence at the competency hearing.

■ In ground of error thirty-nine complaint is made of Maurice Cook's testimony that he took a statement from appellant and gave him various warnings. Appellant asserts that testimony regarding the confession was prejudicial and should not have been admitted at the competency hearing.

Prior to Cook's taking the witness stand, witnesses for the defense and prosecution testified (in front of the jury) without objection concerning both written statements given to the police by appellant. Evidently, each side believed that appellant's ability to understand warnings and give a detailed statement was relevant to a determination of his competency. Error, if any, in the admission of Cook's testimony was cured because the same evidence came in elsewhere without objection. *Boles v. State*, 598 S.W.2d 274 (Tex.Cr.App.1980).

■ Ground of error forty-two involves Cook's testimony that through his conversations with appellant on the date of the offense two shirts were recovered. Not only was identical testimony earlier admitted without objection, but further, appellant's objection was sustained and an instruction to disregard was given. Appellant did not ask for a mistrial. He thus received all the relief requested. *DeRusse v. State*, 579 S.W.2d 224 (Tex.Cr.App.1979).

■ In ground of error forty, appellant avers that the State improperly sought to admit into evidence the written statement Cook obtained from appellant. As noted earlier, this and the other written statement were referred to continuously throughout the competency hearing. The trial court sustained appellant's objection to the offer of the statement and instructed the jury to disregard it. The jury did not receive the written statement. We perceive no error.

In ground of error forty-one appellant complains of testimony given by Dr. Peebles under direct examination at the competency hearing. That testimony was as follows:

"Q. Can you explain the reason or explain the difference in the diagnosis?

"A. Yes, we like to give a person as mild a diagnosis as possible and give them the benefit of the doubt as far as we can, and with some degree of retardation and emotional, social deprivation we would expect that he would be in more difficulty in making adjustment to life, particularly through adolescence and in adulthood. Since that time, he, you know, had been in the penitentiary and then has come out, and a short time after he was out, he according to his own admission, raped again, but this time he killed the lady, and I asked him why he killed her and—

"(Objection)—BY MR. NEWMAN: We object to the doctor going into the details of the alleged offense, because it is not appropriate at this time and is highly prejudicial to the issues of this case. At this time, we'd ask the Court to instruct the jury not to consider it and request a mistrial.

"BY THE COURT: All right, I will sustain your objection. Ladies and gentlemen of the jury, disregard the last statement of Dr. Peebles and Dr. Peebles, you are instructed not to go into the details of the offense that he related to you. You can proceed.

"BY MR. NEWMAN: What was the ruling on the mistrial?

"BY THE COURT: Your motion for mistrial is overruled."

■ It has long been established in Texas that a defendant's competency must be determined in a hearing separate from the trial on the merits. See Art. 46.02, V.A.C.C.P. *Townsend v. State*, 427 S.W.2d 55 (Tex.Cr.App.1968). The guilt or innocence of the defendant is not at issue in such a hearing, and it is improper to introduce evidence of the offense itself. *Ex parte Hagans*, 558 S.W.2d 457 (Tex.Cr. App.1977). Otherwise, the issue which the jury is to determine becomes confused, and the jury is exposed to facts which unduly prejudice it against finding the defendant incompetent. *Brandon v. State*, 599 S.W.2d 567 (Tex.Cr.App.1980).

■ However, not every mention of evidence of the crime itself will be prejudicial. The evidence of the offense presented to the competency jury must be of such a nature as to deny the accused a fair and impartial determination of his competency. See *Brandon*, supra (Opinion On Appeal After Abatement).

■ In the instant case, Dr. Peebles' remarks improperly injected details of the alleged crime itself into evidence at the competency hearing. The trial court, however, promptly and firmly sustained appellant's objection and instructed the jury to disregard Peebles' response. An instruction to disregard improperly admitted evidence is usually sufficient to negate error. *Furtick v. State*, 592 S.W.2d 616 (Tex.Cr. App.1980).

■ Before Peebles testified, witnesses for both sides testified without objection regarding: appellant's prior incarceration in the penitentiary on a rape conviction; appellant's status as a defendant in the instant capital murder prosecution; the possibility that appellant might receive the death penalty and; the victim's name. The only new evidence provided by Peebles was the information that the victim's death occurred during the course of a rape.

Though Peebles' response was improper his testimony was not clearly calculated to inflame the minds of the jury. See *Carey v. State*, 537 S.W.2d 757 (Tex.Cr.App.1976). It did not involve the kind of purposeful prosecution effort to *convince* the jury to consider improper evidence that required reversal in the original *Brandon* case and in *Bruce v. Estelle*, 483 F.2d 1031 (5th Cir.1973), cert. denied 429 U.S. 1053, 97 S.Ct. 767, 50 L.Ed.2d 770 (1977). In short, the error was cured. Grounds of error thirty-nine through forty-two are overruled.

In his final ground of error, appellant complains that the trial court erred by overruling his motion challenging the constitutionality of the prospective juror's oath contained in V.T.C.A. Penal Code, Sec. 12.-31(b).

Sec. 12.31(b), supra, provides that:

"Prospective jurors shall be informed that a sentence of life imprisonment or death is mandatory on conviction of a capital felony. A prospective juror shall be disqualified from serving as a juror unless he states under oath that the mandatory penalty of death or imprisonment for life will not affect his deliberations on any issue of fact."

Appellant, who relies on *Adams v. Texas*, supra, concedes that in the instant case the State did not inquire if the prospective jurors would be affected by the prospect of the death penalty, and that no jurors were excluded under Sec. 12.31(b), supra.

■ Faced with a similar situation in *White v. State*, 610 S.W.2d 504 (Tex.Cr. App.1981), we held, based on our reading of *Adams v. Texas*, supra, that Sec. 12.-31(b) is not per se unconstitutional. The statute cannot be used, however, to exclude jurors on grounds broader than those permitted by the Supreme Court in *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).

■ In *White*, we upheld the defendant's conviction, though the statute was utilized during jury selection, because the

defendant did not prove or contend that it was utilized improperly or that a prospective juror was excluded under it. Appellant's claim is even weaker since, in addition to no prospective jurors being excluded, the statute and the oath contained within it were not referred to during jury selection. Appellant's final ground of error is overruled.

The judgment is affirmed.

CLINTON, Judge, concurring.

For the reasons stated in the dissenting opinion in *Russell v. State*, 665 S.W.2d 771 (Tex.Cr.App.1983), I remain convinced that the observation made in *King v. State*, 553 S.W.2d 105 (Tex.Cr.App.1977) [1] and relied on by the majority today,[2] has over the intervening years proven to be unsound as regards the term "deliberately."

As used in the first special issue, the word "deliberately" is not "simple in meaning," as the continuing debate between lawyers, scholars and judges [3] over its meaning and import well attests.

It is inconceivable to me that the Court has acknowledged the jury's failure to differentiate "deliberately" from "intentionally" would constitute a denial of due process, see *Heckert v. State*, 612 S.W.2d 549 (Tex.Cr.App.1981), yet continues to refuse to require as a matter of course that the jury be informed "distinctly [of] the law applicable to the case," Article 36.14, V.A. C.C.P., in this regard.

Thus, it is clear to me that appellant's objection to the charge on the ground that it failed to guide the jurors' deliberations as to the meaning of "deliberately" in the punishment phase, constituted error.

However, due to the fact that the evidence of "deliberateness" was uncontested, overwhelming and in large part gleaned from appellant's written admissions, I cannot see that the error, under the facts of

this case, was "calculated to injure the rights of the defendant." Article 36.19, V.A.C.C.P.

Accordingly, I concur in the result only of the Court's opinion which overrules grounds of error 30 through 34. Otherwise, I join in the opinion and judgment of the Court.

---

**1.** "Where terms used are words simple in themselves, and are used in their ordinary meaning, jurors are supposed to know such common meaning and terms and under such circumstances such common words are not necessarily to be defined in the charge to the jury." 553 S.W.2d at 107.

**2.** In overruling grounds of error 30 through 34.

**3.** See *Russell*, supra, at 783, n. 8 (Opinion dissenting).